WEIMER, Justice.
|gAt the outset, we note this court’s limited role in this matter, which concerns educational funding and other legislative *1037 restrictions found in the Louisiana Constitution. As appropriately acknowledged by counsel at oral argument, we will not per se address the efficacy of the school voucher or similar educational programs, which are purportedly funded by two legislative instruments from the 2012 Regular Session of the Louisiana Legislature that have been challenged in this case. Rather, our limited judicial inquiry is directed to constitutional issues. While sometimes technical and other times plain in their application, these constitutional provisions are never mere technicalities, but are part of the basic, fundamental provisions in our system of laws. This court is constitutionally obligated to address these issues, for it is the role of the judiciary to determine the meaning and effect of the constitution.
The determination of how to best provide for the education of children is not the role of this court in this matter. We defer that determination to those more learned in the fields of education and public policy. The court’s role is to evaluate the law set forth in the constitution to determine whether the matters addressed by the legislature comply with the relevant constitutional provisions and “not to legislate social policy on the basis of our own personal inclinations.” State v. Smith, 99-0606, 99-2094, 99-2015, 99-2019, p. 11 (La.7/6/00), 766 So.2d 501, 510, quoting Evans v. Abney, 396 U.S. 435, 447, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970). From a judicial perspective, the questions presented could have arisen as a result of the consideration of any number of issues confronted by the legislature. Nevertheless, resolution of the constitutional issues presented will impact the school voucher and related programs.
This declaratory judgment action challenges the validity of two legislative instruments enacted during the 2012 Regular Session of the Louisiana Legislature. | sSpecifically, the topics of this litigation are Senate Concurrent Resolution No. 99 (“SCR 99”) and 2012 La. Acts 2 (“Act 2” or “Act”), each of which addresses funding and a mechanism for the state to pay for the tuition costs of elementary and secondary school students physically attending, or otherwise undertaking individual course work, from nonpublic schools.
The case is before this court on direct appeal from a judgment declaring SCR 99 and Act 2 unconstitutional on grounds that those legislative instruments divert funds constitutionally reserved for public schools. Additionally, this court granted and consolidated the plaintiffs’ appeal, so as to expeditiously resolve all of the issues presented.
After reviewing the record, the legislative instruments, and the constitutional provisions at issue, we agree with the district court that once funds are dedicated to the state’s Minimum Foundation Program for public education, the constitution prohibits those funds from being expended on the tuition costs of nonpublic schools and nonpublic entities. Unlike the district court, we also find the procedures employed to enact SCR 99 violated the constitution inasmuch as that legislative instrument was intended to have the effect of law, but several requirements for enacting law were not observed. We find, after analytically severing the unconstitutional provisions of Act 2, that Act 2 does not violate the constitution’s “one-object” rule.
FACTUAL AND PROCEDURAL BACKGROUND
In 2012, the Louisiana Legislature passed Act 2, which, among other provisions, creates a “Course Choice Program,” and substantially amends the “Student Scholarships for Educational Excellence Program” (“SSEEP”), which is commonly referred to as the voucher program. As amended, the SSEEP now requires |4the payment of Minimum Foundation Program *1038 (“MFP”) funds by the Louisiana Department of Education (“Department”) to nonpublic schools and further requires the Department to “transfer scholarship payments to each participating school on behalf of the responsible city or parish school district.” La. R.S. 17:4017. Additionally, the Course Choice Program requires the payment of MFP funds by the Department to online education providers, virtual education providers, postsecondary education institutions, and entities that offer vocational or technical course work. See La. R.S. 17:4002.1-4002.6. The program also recognizes that students enrolled in home study programs are eligible participating students. Id.
In the same 2012 regular session, the legislature also passed SCR 99, the vehicle by which the legislature “approved” the 2012-2013 MFP formula adopted by the Louisiana Board of Elementary and Secondary Education (“BESE”) as required by La. Const, art. VIII, § 13(B), which dictates that BESE “annually develop and adopt a formula which shall be used to determine the cost of a minimum foundation program of education in all public elementary and secondary schools.” MFP funds are appropriated as a separate and distinct line item in the state budget. As a result, SCR 99 in part approves the formula adopted by BESE for funding the implementation of the programs created in Act 2, including this provision:
The amount for which the city or parish school district is responsible will be funded with a transfer from the MFP allocation for the city or parish school district in which the participating student resides to the participating nonpublic or public school on behalf of each student awarded a scholarship.
SCR 99, XII(B)(6).
Besides the SSEEP/voucher program and the Course Choice Program, SCR 99 also describes an early high school graduation program:
1 ¿The purpose of the Early High School Graduation Scholarship Program is to provide tuition and fee assistance to students graduating early from a public high school including state funded Scholarship student[s] thus enabling and encouraging the student to attend college in any public or private institution of higher education in Louisiana.
SCR 99, XII(C).
The plaintiffs — the Louisiana Federation of Teachers, the East Baton Rouge Federation of Teachers, the Jefferson Federation of Teachers, as well as one parent and one teacher of public school children — filed a petition for declaratory judgment, naming as defendants the Department and BESE.[1] The plaintiffs challenged the constitutionality of SCR 99 and Act 2 and also sought preliminary and permanent injunc-tive relief.[2] The matter was consolidated with two similar declaratory judgment cases later brought by the Louisiana School Boards’ Association and various member local school boards,[3] as well as the Louisiana Association of Educators and various member organizations and individual members.
*1039 In the several petitions for declaratory judgment, the plaintiffs alleged SCR 99 and Act 2 are an unconstitutional diversion of MFP funds, pursuant to La. Const, art. VIII, § 13(B), which requires the state to annually develop and adopt a formula to determine the cost of a minimum foundation program of education in all public elementary and secondary schools, as well as to equitably allocate the funds to parish and city school systems. The plaintiffs further asserted SCR 99 and Act 2 have | ^unconstitutionally allocated MFP funds that are constitutionally allocated to parish and city school systems to such entities as private schools, parochial schools, private “course providers,” postsecondary education institutions, and corporations that offer vocational or technical course work in their field, to parents who choose home schooling, and to new charter schools outside of the parish or city school system. Additionally, the plaintiffs contended SCR 99 and Act 2 unconstitutionally divert the local portion of the per-pupil amount mandated in the MFP, in violation of La. Const, art. VIII, § 13(C) and (D).[4]
| -According to the plaintiffs, the legislature unconstitutionally passed Act 2, in violation of La. Const, art. Ill, § 15(A) and (C),[5] which requires that a bill be confined *1040 to one object and that no bill shall be amended in either house to make a non-germane change to the bill as introduced.
Moreover, the plaintiffs alleged SCR 99 violates La. Const, art. Ill, § 2(A)(3)(a),[6] which requires that a favorable vote of two-thirds of the elected members of each house is required for passage of a law when a matter is considered after the eighty-second calendar day of the session. The plaintiffs alleged SCR 99 was passed on the eighty-fifth day of the legislative session, and the members of the Louisiana House of Representatives (“House”) voted 51 in favor and 49 against; thus, the Isfavorable two-thirds vote was not achieved. In addition, the plaintiffs alleged SCR 99 violated La. Const, art. Ill, § 15(G),[7] which requires that no bill shall become law without the favorable vote of at least a majority of the members elected to each house. The plaintiffs contend only 51 of 105 members of the House voted in favor of SCR 99; thus, SCR 99 did not receive a favorable vote of the majority (53) of the elected members.
The matter proceeded to a trial on the merits. Before issuing a judgment, the district court considered arguments on an exception of lack of subject matter jurisdiction filed by the defendants. In support of their exception, the defendants argued the plaintiffs’ petition for declaratory judgment raises issues that are nonjusticiable at this time. In particular, the defendants urged SCR 99 is merely aspirational and that there is a constitutional process that must take place in the succeeding year before the state will know whether some of the programs contained in SCR 99 will be authorized. In addition, the defendants argued some of the programs contained in Act 2 are not yet funded.
In contrast, the plaintiffs asserted the testimony indicated the defendants have already issued a bulletin on the Early Choice Provider Program, have put out advertising for service providers, and put together a list of service providers in accordance with Act 2. As such, the plaintiffs maintained the state has begun to implement the programs set forth in Act 2.
The district court denied the exception of lack of subject matter jurisdiction in oral reasons, stating:
*1041 | ciWith regard to the exception of lack of subject matter jurisdiction, regarding the narrow issues of the Early High School Graduation Scholarship Program and the Course Choice Program, the court is going to deny the exception. Frankly, the court believes that the defendant is missing the point. They’re asking for an exception of lack of subject matter jurisdiction as it pertains to those two programs, but the suit that the plaintiffs filed deal[s] with the unconstitutional diversion of funds, or alleged unconstitutional diversion of funds, regardless of which program, and the above two programs were only given as examples in the plaintiffs’ briefs. Further, during the course of the hearings, we have learned that the state has expended funds to [move] forward both of those programs during this fiscal year; therefore, the exception of lack of subject matter jurisdiction on those narrow grounds is denied.
At the conclusion of trial, the district court entered a judgment declaring Act 2 and SCR 99 unconstitutional. In a lengthy opinion, the district court first determined that SCR 99 does not violate La. Const, art. Ill, § 2(A)(3)(a), which requires that a favorable vote of two-thirds of the elected members of each house for passage of a law when a matter is considered after the eighty-second calendar day of the session. In particular, the district court reasoned La. Const, art. Ill, § 2(A)(3)(a), by its own terms, applies only to matters “intended to have the effect of law,” and concluded SCR 99 does not have the effect of law. In support, the district court noted the constitution vests the legislature with limited jurisdiction to approve or decline the MFP formula and that this approval is distinct from the passage of bills into law. The district court reasoned the legislature may not change the content of the MFP formula and there is no requirement that the legislature present the resolution to the governor for signing. Moreover, the district court rejected the plaintiffs’ assertion that Joint Rule 20(A)(l)(a)(iii)[8] suggests that the resolution to approve the MFP hnformula is intended to have the effect of law. The district court relied on the testimony of the Clerk of the House, who was one of the drafters of the Joint Rule and who testified that Rule 20(A)(l)(a)(iii) was not intended to suggest the resolution to approve MFP funds was considered to have the effect of law, but that it was placed in the Rule to ensure that such resolution would not have to be considered within the limitation for filing bills placed on legislators in those particular years.
In addition, the district court found SCR 99 does not violate La. Const, art. Ill, § 15(G), which requires that no bill shall become law without the favorable vote of at least a majority of the members elected to each house. The district court relied on its previous holding that SCR 99 is not intended to have the effect of law, which precludes the application of Article III, § 15(G). The district court also found SCR 99 was properly passed in the House by a majority of the voting members present.
Next, the district court found Act 2 does not violate La. Const, art. Ill, § 15, which requires that a bill be confined to one object. Relying on State v. O’Dell, 253 La. 418, 218 So.2d 318 (1969), the district court noted a bill is regarded as having one *1042 object if the components are “reasonably related and have a natural connection to the general subject matter of the legislation.” After reviewing Act 2 as a whole, the district court concluded the amendments and new sections passed in Act 2 are reasonably related and have a natural connection to the general subject matter of Act 2.
However, the district court found that Act 2 and SCR 99 unconstitutionally divert MFP funds constitutionally mandated to be allocated to public elementary and secondary schools to nonpublic entities, in violation of La. Const, art. VIII, § 13(B). In support, the district court pointed out that Article VIII, § 13(B) requires BESE to |,/‘annually develop and adopt a formula which shall be used to determine the cost of a minimum foundation program of education in all public elementary and secondary schools as well as to equitably allocate the funds to parish and city school systems.” La. Const, art. VIII, § 13(B) (emphasis added by district court). Article VIII, § 13(B) further provides the legislature shall annually appropriate funds, as determined by applying the approved MFP, “in order to insure a minimum foundation of education in all public elementary and secondary schools.” Id. (emphasis added by district court). The district court stated:
The terms “public elementary and secondary schools” and “parish and city school systems” as used in Article VIII, § 13(B) of the Louisiana Constitution are plain and unambiguous. The phrase “public elementary and secondary schools” is generally understood to mean schools funded with tax revenue and administered by a governmental body that offers instruction in kindergarten through 12th grade. • The phrase “parish and city school systems” is generally understood to mean those school systems either created pursuant to Article VIII, § 9(A) of the Louisiana Constitution or recognized pursuant to Article VIII, § 10 of the Louisiana Constitution. See e.g., LSA-R.S. 17:51 (creating a “parish school board for each of the parishes”), LSA-R.S. 17:64 (creating the Zachary Community School Board), LSA-R.S. 17:66 (creating the Central Community School Board) and LSA-R.S. 17:72 (creating the city of Baker School Board).
In addition, the district court noted the delegates to the Louisiana Constitutional Convention of 1973 recognized that Article VIII, § 13(B) “takes care of the public schools,” which establishes the legislature knew the distinctions they were making between public and private schools. Moreover, the district court pointed out the convention delegates stripped from the final version of Article VIII, § 13, a floor amendment that would have siphoned off money in the direction of private schools, for fear that such a provision “opens the door for the very thing we are talking about trying to keep out of the constitution.” The district court maintained the convention delegates recognized the purpose of Article VIII, § 13(B) was “to insure hi>that there are certain minimum standards in public education, met in all of the school systems across the state and that the [poor] parishes do not suffer a lack of adequate public education.” The district court also recognized Article VIII, § 13(A), as originally drafted, included an authorization for the legislature to appropriate funds to assist students in private schools, in addition to free textbooks, bus transportation, lunch programs, and other similar types of aid available to private schools at the time, but was ultimately amended to limit private school aid. The district court also distinguished this case from Triplett v. Board of Elementary and Secondary Education, 09-0691 (La.App. 1 Cir. 7/13/09), 21 So.3d 401, noting that in Triplett, MFP funds were transferred to a *1043 state-run Recovery School District, which is a public school district. In the instant case, MFP funds are being transferred to nonpublic entities.
The district court also found that SCR 99 and Act 2 unconstitutionally divert local funds included in the MFP that are constitutionally mandated to be allocated to public elementary and secondary schools to nonpublic entities, in -violation of La. Const, art. VIII, § 13(C) and La. Const, art. VI, § 29(A).[9] Louisiana Const, art. VIII, § 13(C) requires each school board to levy an ad valorem tax to raise local funds for the support of elementary and secondary schools. The district court stated:
113The key point of Plaintiffs’ argument is provided in the statutes above [La. R.S. 17:97.1 and La. R.S. 47:338.84]; specifically in the statutory language which forbids BESE from considering the local funding in determining the MFP. Plaintiffs have shown that Defendants are not using locally generated funds to pay for the school voucher program because Defendants have no access to the local accounts in which such funds are maintained. Rather, Defendants are reducing the MFP allocations to public schools by equivalent amounts thus violating the statutes cited above by considering the local funds when determining the MFP formula. Whether called a “diversion” or something else, the result is the same. The public school systems of the State of Louisiana will lose funding they would have received from the Defendants for the operation of their schools and for the benefit of their students. Neither the constitutional nor statutory provisions outlined hereinabove permit such reduction in funding.
The defendants have now directly appealed the district court judgment to this court, which has jurisdiction over the appeal pursuant to La. Const, art. V, § 5(D).[10] The plaintiffs are also before this court pursuant to an appeal which we granted and consolidated with the defendants’ direct appeal so as to expeditiously resolve all issues.
LAW AND ANALYSIS
The sole issue before this court is whether the educational funding mechanisms or other content of two legislative instruments, SCR 99 and Act 2, violate constitutional restrictions.
The Louisiana Constitution of 1974 contains a section specifically addressing educational funding. Under La. Const, art. VIII, § 13, the legislature is required to appropriate funds for two purposes. The first purpose is described under Article VIII, § 13(A): “The legislature shall appropriate funds to supply free school books and other materials of instruction prescribed by the State Board of Elementary and Secondary Education to the children of this state at the elementary and secondary 114levels.” The second purpose is de *1044 scribed under Article VIII, § 13(B) and requires the legislature to “fully fund the current cost to the state” of “a minimum foundation program of education in all public elementary and secondary schools,” and the “funds appropriated shall be equitably allocated to parish and city school systems.”
This second purpose, relating to the MFP of public education, is the central topic of much of the parties’ arguments. Keying on the word “minimum” in Article VIII, § 13(B), the defendants essentially argue that all the state is required to do is calculate a minimum amount for public education and, once that requirement is met, the state can allocate MFP funds in any fashion, such as by diverting money to nonpublic schools and course providers. The plaintiffs urge that MFP funds cannot be diverted to nonpublie schools and other course providers because Article VIII, § 13(B) restricts MFP funds “to parish and city school systems.”
Unlike provisions for general appropriations, which are solely the province of the legislature,[11] the constitution dictates specific and unique procedures for educational expenditures made through the MFP. Uniquely, MFP expenditures do not originate with the legislature. Instead, BESE is required to “annually develop and adopt a formula which shall be used to determine the cost of a minimum foundation program of education in all public elementary and secondary schools as well as to equitably allocate the funds to parish and city school systems.” La. Const, art. VIII, § 13(B). BESE transmits its proposed MFP formula to the legislature, which then has limitations placed on the actions it is allowed to take. Unlike the situation for general appropriations, the legislature may not amend the MFP formula — it can only grant 1^“approval” or “may return the formula adopted by the board to the board and may recommend to the board an amended formula for consideration by the board and submission to the legislature for approval.” Id.[12]
Once the MFP formula is approved by the legislature, the constitution requires the legislature to “fully fund the current cost to the state of such a program as determined by applying the approved formula.” La. Const, art. VIII, § 13(B). The MFP is also unique in that the authority of the governor is limited. See Id. (“Neither the governor nor the legislature may reduce such appropriation, except that the governor may reduce such appropriation using means provided in the act containing the appropriation provided that any such reduction is consented to in writing by two-thirds of the elected members of each house of the legislature.”); see also Joint Rules of the Louisiana Senate and House, Rule No. 20(A)(l)(b)(iii) (indicating legislative approval of the MFP is accomplished by a resolution); La. Const, art. Ill, § 17(B) (“No ... resolution shall require the signature or other action of the governor to become effective.”).
The MFP itself is not the only constitutional contention among the parties. Other constitutional limitations upon the legislature, such as confining a bill to one object and the proper procedures for introducing, calendaring, and approving the *1045 MFP, have all been contested. See La. Const, art. Ill, § 15(A) and (G) and § 2(A)(3)(a).
Therefore, in order to evaluate the parties’ arguments, it is necessary to examine in greater detail both the form and substance of the legislative instruments at issue.
1 ifiThe Legislative Instruments
As noted earlier, the vehicle by which the legislature nominally approved BESE’s 2012-2013 MFP formula was SCR 99. It is a 28-page document, so space constraints preclude reproducing SCR 99 in its entirety in this opinion. To the uninitiated in the budgetary process and the administration of education, SCR 99 is largely an arcane document, replete with jargon and esoteric terms not defined in the document, but which are apparently known to those few who are well-initiated in the state’s budgetary processes and in the administration of education. Owing to its length and complexity, a general overview of SCR 99 (which is drawn from the document itself, trial evidence, and other commentary) must presently suffice.
The funding provisions for the MFP,[13] as described in SCR 99, consist of a three-level formula. Each MFP level essentially has its own formula.
Level One (entitled “COST DETERMINATION AND EQUITABLE DISTRIBUTION OF STATE AND LOCAL FUNDS”) takes the number of pupils across the state and multiplies that number by $3,855.[14] This is the “State and Local Base Per Pupil Amount,” and the cost of this base amount is allocated between the state and local school districts. The base per-pupil amount of $3,855 is then subject to a baseline funding allocation of 65 percent to the state, and 35 percent to local school districts. The ultimate allocation of MFP funds, however, by the state to any given school district is required to be done “equitably” (La. Const, art. VIII, § 13(B)) in order “to insure that each public school child in this state receives an equal educational opportunity regardless of the wealth of the parish in which the child | ^resides.” Louisiana Association of Educators v. Edwards, 521 So.2d 390, 391 (La.1988), citing verbatim transcripts of the 1973 constitutional convention. Local property taxes, sales taxes, and other local revenues are factors considered in arriving at an equitable allocation of state funds to any given local school district, but “[i]n no event shall the State Share of the Total Level 1 Costs be less than 25% for any district.”
Level Two (entitled “INCENTIVE FOR LOCAL EFFORT”) is intended to be a reward to the local districts for raising revenue. Because local revenue is a factor which decreases the state’s contribution in Level One (and therefore increases the local contribution), Level Two “[rjewards systems that contribute a greater proportion towards the cost of education by increasing local tax revenues.” Minimum Foundation Program, 2011-2012 Handbook, p. 2, Louisiana Dept. of Educ. (July 2011) (“Handbook”).[15] A local school system can be rewarded in Level Two of the MFP formula if the system raises an “amount over [the] Level 1 target.” Id.
*1046 Level Three (entitled “UNEQUAL-IZED FUNDING”) includes inter alia continued funding for teacher pay raises in prior years, funding for foreign language instructors, and “hold harmless funding.” Id. The hold harmless funding refers to a fundamental change in the way the MFP formula was structured in fiscal year 1992-1993; this funding is intended to improve funding to districts that fared worse once the structure was changed. Id. at 81.
SCR 99 indicates that MFP funding shall be used as follows:
The following opportunities are provided for parental choice and shall be funded through the Minimum Foundation Program:
A. Educational Service Providers
|1S1. Authorized educational service providers are those entities approved by the State to provide approved educational courses to students statewide. This program will be fully implemented in Fiscal Year 2013-2014. For Fiscal Year 2012-13, city, parish and other local school systems shall ensure that sufficient funding is available for dual enrollment courses to meet the needs of students as has been the practice in prior years.
SCR 99, XII(A)(1).
As will be shown later in this opinion, Act 2 implemented this part of SCR 99 under what has become known as the Course Choice Program. However, as it concerns funding, for present purposes, it must be noted that while some eligible course providers are public institutions, SCR 99 directs funding to be made to approved nonpublic institutions, such as “On-line Course Providers,” and “commercial industry based educational programs.” SCR 99, XII(A)(l)(b) and (c).
Besides approving funding for nonpublic course providers, SCR 99 funds an expanded SSEEP/voucher-based program. As explained in SCR 99, XII(B):
Another opportunity for parents to exercise parental choice is the [Student] Scholarships for Educational Excellence Program. This program provides parental choice for certain public school students enrolled in low performing public schools and provides an opportunity for these students to attend eligible nonpublic and public schools. In fiscal year 2012-13, this program will transition to being funded through the MFP and may provide for a statewide expansion.
The details for funding both the SSEEP/voucher program and the Course Choice Program in fiscal year 2012-2013 are complex and need not be addressed here. For the core of this case, the most essential funding effect of SCR 99 is that it provides funding for both the SSEEP/voucher program and the Course Choice Program to be paid from the MFP.
Besides funding, other aspects of SCR 99 are disputed in this case. Specifically, if SCR 99 was “intended to have the effect of law” (La. Const, art. Ill, § 2(A)(3)(a)), then other constitutional requirements apply, such as certain deadlines 119and voting requirements discussed later in this opinion. However, to set the stage for our later analysis of the dispute surrounding these essentially procedural aspects of SCR 99, other details of SCR 99 bear mention.
Under the rubric of the SSEEP, SCR 99 provides:
• In administering the scholarship program, BESE shall establish an accountability mechanism that abides by the law. [SCR 99, XII(B)(9) ]
• BESE shall measure the rate at which all schools serving scholarship students admit and serve students with special education needs. BESE may establish a lower rate of funding for those schools not meeting a minimum threshold of special education enrollment established by BESE. [SCR 99, XII(B)(10) ]
*1047 • For purposes of the scholarship program, BESE -will adopt an annual maximum tuition rate increase for participating nonpublic schools by establishing a percentage of the per pupil MFP in the district where the nonpublic school is located. Such nonpublic school may not increase its annual tuition for scholarship students by an amount to exceed that percentage. [SCR 99, XII(B)(4)]
• Transfers of scholarship payments shall be made by the Department of Education on behalf of the responsible city or parish school districts to eligible nonpublic schools and eligible public schools in four equal installments throughout the school year. [SCR 99, XII(B)(8) ]
Under the rubric of “COST DETERMINATION AND EQUITABLE DISTRIBUTION OF STATE AND LOCAL FUNDS,” SCR 99 provides that the “State and Local Base Per Pupil Amount” of the MFP is $3,855. However, SCR 99 provides for a potential departure from this amount in future years:
In the event no provision for an annual increase has been provided and this Resolution remains in effect in the Fiscal Year 2013-2014 or thereafter, the State Board of Elementary and Secondary Education shall annually adjust the state and local base per pupil amount with approval by the Joint Legislative Committee on the Budget. If the Joint Legislative Committee on the Budget does not approve the rate established by the State Board of Elementary and Secondary Education, then an annual growth adjustment of 2.75% shall automatically be applied to the state and local base per pupil amount beginning in the Fiscal Year 2013-2014.
SCR 99,11(A)(4).
RpNotably, SCR 99 describes an Early High School Graduation Scholarship Program, but there is no counterpart to this program in Act 2. The full description is reproduced supra, but as it concerns funding, SCR 99 makes available various amounts, depending upon how early a student graduates and the funds are described as a percentage of “MFP state and local share per pupil allocation for the district in which the student resided at the time of graduation.” SCR 99, XII(C)(1) and (2).
Like SCR 99, Act 2, which is the other challenged legislative instrument, is a document the length of which precludes full reproduction in this opinion. In shortest summary, Act 2 creates the disputed Course Choice Program and the SSEEP/voucher program, both of which were funded via SCR 99. The Course Choice Program is a new enactment; under Act 2 the SSEEP/voucher program is an amendment of the existing “Student Scholarships for Educational Excellence Act.” Prior to amendment, the SSEEP allowed funding vouchers to pay for nonpublic schools for students who lived in a municipality with a population of at least 300,000 and whose school district had schools taken over by the state’s Recovery School District. Act 2 expands the geographic eligibility statewide because, instead of imposing a municipal population limitation and requiring that the state’s Recovery School District has taken over any of a given district’s schools, Act 2 establishes as a threshold for eligibility that a student would otherwise attend a public school assigned a grade of “C,” “D,” or “F” under the school and district accountability system. A maximum family income threshold further restricts individual eligibility, both before and after SSEEP was amended by Act 2. See generally, La. R.S. 17:4013(2).
Under Act 2, funds are sent by the state to schools accepting the SSEEP/voucher *1048 program. These voucher funds come from the MFP. See La. R.S. 17:4013; 17:4016; 17:4017.
| ^Principles of Review for Constitutionality
This court reviews judgments declaring legislative instruments unconstitutional de novo. See State v. All Property and Casualty Insurance Carriers Authorized and Licensed to do Business in the State, 06-2030, p. 6 (La.8/25/06), 937 So.2d 313, 319; Louisiana Municipal Association v. State, 04-0227, p. 45 (La.1/19/05), 893 So.2d 809, 842. In conjunction with this review, certain principles apply. As a general rule, legislative instruments are presumed to be constitutional; therefore, the party challenging the validity of a legislative instrument has the burden of proving its unconstitutionality. See State v. Citizen, 04-1841, p. 11 (La.4/1/05), 898 So.2d 325, 334; Louisiana Municipal Association, 04-0227 at 45, 893 So.2d at 842; Board of Commissioners of North Lafourche Conservation, Levee and Drainage District v. Board of Commissioners of Atchafalaya Basin Levee District, 95-1353, pp. 3-4 (La.1/16/96), 666 So.2d 636, 639.
Because the provisions of the Louisiana Constitution are not grants of power, but instead are limitations on the otherwise plenary power of the people of the state, exercised through the legislature, the legislature may enact any legislation that the constitution does not prohibit. Louisiana Municipal Association, 04-0227 at 45, 893 So.2d at 842-43; Polk v. Edwards, 626 So.2d 1128, 1132 (La.1993); Board of Commissioners of Orleans Levee District v. Department of Natural Resources, 496 So.2d 281, 286 (La.1986). Consequently, a party challenging the constitutionality of a legislative instrument must point to a particular provision of the constitution that would prohibit the enactment of the legislative instrument and must demonstrate clearly and convincingly that it was the constitutional aim of that provision to deny the legislature the power to enact the legislative instrument in question. See World Trade Center Taxing District v. All Taxpayers, Property Owners, 05-0374, p. 12 (La.6/29/05), 908 So.2d 623, 632; Caddo-Shreveport Sales and Use Tax Commission v. Office of Motor Vehicles Department of Public Safety and Corrections of the State, 97-2233, pp. 5-6 (La.4/14/98), 710 So.2d 776, 779; Polk, 626 So.2d at 1132. A constitutional limitation on the legislative power may be either express or implied. World Trade Center Taxing District, 05-0374 at 12, 908 So.2d at 632; Caddo-Shreveport Sales and Use Tax Commission, 97-2233 at 6, 710 So.2d at 779-80.
 Finally, because it is presumed that the legislature acts within its constitutional authority in promulgating a legislative instrument, this court must construe a legislative instrument so as to preserve its constitutionality when it is reasonable to do so. See State v. Fleury, 01-0871, p. 5 (La.10/16/01), 799 So.2d 468, 472; Moore v. Roemer, 567 So.2d 75, 78 (La.1990). In other words, if a legislative instrument is susceptible to two constructions, one of which would render it unconstitutional or raise grave constitutional questions, the court will adopt the interpretation of the legislative instrument which, without doing violence to its language, will maintain its constitutionality. See Hondroulis v. Schuhmacher, 553 So.2d 398, 416-17 (La.1988). Nevertheless, the constitution is the supreme law of this state to which all legislative instruments must yield. See World Trade Center Taxing District, 05-0374 at 12, 908 So.2d at 632; Caddo-Shreveport Sales and Use Tax Commission, 97-2233 at 6, 710 So.2d at 780. When a legislative instrument conflicts with a constitutional provision, the legislative instrument must fall. See Caddo- *1049 Shreveport Sales and Use Tax Commission, 97-2233 at 6, 710 So.2d at 780.

Diversion of MFP Funds

Legislative instruments SCR 99 and Act 2 undeniably divert state MFP funds from public to nonpublic schools. The question at hand is whether diverting state | ¡sMFP funds to nonpublic schools violates constitutional restrictions. Setting aside for a moment other programs provided for by SCR 99 and Act 2, the diversion of state MFP funds can be most clearly seen under the SSEEP/voucher program. A student who receives an SSEEP/voucher program is counted when determining the MFP funding, but the per-pupil amount of the MFP funds calculated for that student is paid by the state directly to the nonpublic [16] voucher school. See La. R.S. 17:4017.[17] Having found a diversion of state MFP funds to nonpublic schools, the district court determined that such a diversion violated La. Const, art. VIII, § 13(B).
Less clear from the present record is whether local funds-as opposed to state revenues-are diverted to the SSEEP/voucher program. While the record is replete with documents generated by state agencies describing costs to local school districts for the SSEEP/voucher program, the state labored at length at trial to demonstrate that the documents’ descriptions were not completely accurate and that the voucher program would either result in savings to local public schools or at the least, not take away local funds from public schools. The district court, however, found that local funds were indeed being diverted under SCR 99 and Act 2. Having found a diversion of state MFP funds to nonpublic schools, the district court determined that such a diversion violated La. Const, art. VIII, § 13(C).
 I^With the issues on appeal thus framed as whether Act 2 and SCR 99 unconstitutionally divert state and/or local funds, we address each issue in turn. We begin, as we must, with the applicable constitutional language. See Louisiana Municipal Association v. State, 00-0374, p. 5 (La.10/6/00), 773 So.2d 663, 667. When a constitutional provision is plain and unambiguous and its application does not lead to absurd consequences, its language must be given effect. Id. 00-0374 at 5-6, 773 So.2d at 667; State ex rel. Guste v. Board of Commissioners of Orleans Levee Dist., 456 So.2d 605, 609 (La.1984); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354, 356 (La.1980). When interpreting constitutional language, the same general rules used in interpreting laws and other written instruments are followed. See Caddo-Shreveport Sales & Use Tax Commission, 97-2233 at 6, 710 So.2d at 780; Radiofone, Inc. v. City of New Orleans, 93-0962, p. 6 (La.1/14/94), 630 So.2d 694, 698.
State MFP funds are addressed in La. Const, art. VIII, § 13(B). Though we have earlier excerpted sections when describing the process by which the MFP is developed, to evaluate what restrictions Article VIII, § 13(B) may contain, the full paragraph now bears noting:
*1050 Minimum Foundation Program. The State Board of Elementary and Secondary Education, or its successor, shall annually develop and adopt a formula which shall be used to determine the cost of a minimum foundation program of education in all public elementary and secondary schools as well as to equitably allocate the funds to parish and city school systems. Such formula shall pro.-vide for a contribution by every city and parish school system. Prior to approval of the formula by the legislature, the legislature may return the formula adopted by the board to the board and may recommend to the board an amended formula for consideration by the board and submission to the legislature for approval. The legislature shall annually appropriate funds sufficient to fully fund the current cost to the state of such a program as determined by applying the approved formula in order to insure a minimum foundation of education in all public elementary and secondary schools. Neither the governor nor the legislature may reduce such appropriation, [^except that the governor may reduce such appropriation using means provided in the act containing the appropriation provided that any such reduction is consented to in writing by two-thirds of the elected members of each house of the legislature. The funds appropriated shall be equitably allocated to parish and city school systems according to the formula as adopted by the State Board of Elementary and Secondary Education, or its successor, and approved by the legislature prior to making the appropriation. Whenever the legislature fails to approve the formula most recently adopted by the board, or its successor, the last formula adopted by the board, or its successor, and approved by the legislature shall be used for the determination of the cost of the minimum foundation program and for the allocation of funds appropriated.
The state defendants argue there is no language in Article VIII, § 13(B) prohibiting the state from including SCR 99 and Act 2 programs in the MFP formula. Emphasizing the first two sentences of Article VIII, § 13(B), the defendants argue the constitution only requires that the formula provide for “the cost of a minimum foundation program of education” in all public schools. Otherwise, the constitution provides no direction to or limitation on BESE and the legislature with regards to the MFP formula, as the defendants further argue in reliance on Jones v. State Board of Elementary and Secondary Education, 05-0668, 05-0669, p. 8 (La.App. 1 Cir. 11/4/05), 927 So.2d 426, 431 (“BESE is only required to annually develop and adopt a formula.... The Louisiana Constitution does not require that any particular items be included in the formula nor does it require that the formula be based on actual costs.”).
These arguments miss the point. Because the Louisiana Constitution is fundamentally structured such that it contains limitations, not grants, of power, we are tasked with discerning whether the constitution contains any relevant limitation on the MFP funds. More simply stated, the constitutional question is not about what items BESE may put into the MFP formula, but whether the constitution restricts the use of MFP funds, when as here, BESE has developed and the legislature has | 2iiapproved the MFP formula based on the specific and unique provision outlined in Article VIII, § 13(B).
In Article VIII, § 13(B), we find clear and unambiguous restrictions upon the use of MFP funds. The sixth sentence of the paragraph states in pertinent part: “The funds appropriated shall be equitably allocated to parish and city school sys- *1051 terns.” (Emphasis added.) Under well-established rules of interpretation, the word “shall” excludes the possibility of being “optional” or even subject to “discretion,” but instead “shall” means “imperative, of similar effect and import with the word ‘must.’” Sensebe v. Canal Indem. Co., 10-0703, p. 9 (La.1/28/11), 58 So.3d 441, 447, citing Borel v. Young, 07-0419 (La.11/27/07), 989 So.2d 42, Pittman Construction Co. v. Housing Authority of Opelousas, 167 F.Supp. 517, 523 n. 38 (W.D.La.1958), aff'd, 264 F.2d 695 (5th Cir.1959), and Black’s Law Dictionary 1375 (6th ed. 1990). Therefore, even if the first two sentences of Article VIII, § 13(B) could be construed as permitting BESE to include voucher and other nonpublic school programs in the MFP formula once the minimum baseline for public education is met, the MFP funds still must be allocated equitably to “parish and city school systems.” [18]
Recalling that a constitutional limitation on legislative power may either be express or implied (World Trade Center Taxing District, 05-0374 at 12, 908 So.2d at 632), we find the force of the express, plain language restriction of Article VIII, § 13(B) silences the defendants’ remaining arguments.
In the defendants’ view, it is constitutionally permissible to draw from MFP funds because “if a child chooses an Act 2 program, the local district will not be | ¡^required to spend money to educate the child.” This argument has been alternatively stated that it is constitutionally permissible that “if the student goes to a private alternative, the money follows the student to that private alternative.” In support, the defendants point out that La. Const, art. VIII, § 1 states: “The legislature shall provide for the education of the people of the state and shall establish and maintain a public educational system.” The defendants argue it is permissible for the state to fund private educational alternatives, because “maintain[ing] a public educational system” is a separate requirement from the broader goal of “provid[ing] for the education of the people of the state.”
It is precisely because “providing] for the education of the people of the state” is a broader goal that the defendants’ argument fails. “[I]t is well-settled that when two statutes apply to the same situation, the specific statute prevails over the general one.” Silver Dollar Liquor, Inc. v. Red River Parish Police Jury, 10-2776, p. 10 (La.9/7/11), 74 So.3d 641, 648. The same rule, of a specific provision prevailing over a general provision, holds true for constitutional provisions. See City of New Orleans v. Louisiana Assessors’ Retirement and Relief Fund, 05-2548, p. 17 (La.10/1/07), 986 So.2d 1, 15 (“As a general rule, articles of the constitution are to be construed and interpreted using the same canons of interpretation applicable to statutes and written instruments.”). The constitution specifically addresses the MFP in Article VIII, § 13(B), which we have earlier noted, contains a restriction on the use of MFP funds such that those funds cannot be diverted to nonpublic entities. Thus, the specific restriction of MFP funds is unaffected by the broader goal of “pro-vidfing] for the education of the people of the state” in Article VIII, § 1.
The rule of the specific provision prevailing over a general provision is sometimes *1052 invoked when two provisions are deemed to be in conflict. See Perschall v. State, 96-0322, p. 22 (La.7/1/97), 697 So.2d 240, 255 (“If one constitutional provision addresses a subject in general terms, and another with the same subject in a more detailed way, the two should be harmonized if possible, but if there is any conflict, the latter will prevail”). Here, the defendants argue that to find a funding restriction in Article VIII, § 13(B) casts that provision into direct conflict with the stated goal of “provid[ing] for the education of the people of the state” in Article VIII, § 1. We are careful to point out that we find no conflict between the specific funding mechanism described in Article VIII, § 13(B) and the more generally stated goal of “provid[ing] for the education of the people of the state” in Article VIII, § 1. See Louisiana Assessors’ Retirement and Relief Fund, 05-2548 at 17, 986 So.2d at 15 (“[Wjhere it is possible, courts have a duty in the interpretation of a statute (or by analogy, constitutional provision) to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter.”). The two provisions from Article VIII § 1 and § 13(B) — are easily harmonized, as follows.
In Article VIII, § 1, the goal of “providing] for the education of the people of the state” is implemented through another specific provision, Article VIII, § 13(A), which provides: “The legislature shall appropriate funds to supply free school books and other materials of instruction prescribed by the State Board of Elementary and Secondary Education to the children of this state at the elementary and secondary levels.” As the defendants acknowledge, under the language just quoted, the state allocates funding for textbooks for students attending nonpublic schools. See generally, La. R.S. 17:351(A)(1) (providing without limitation to where students attend school, and with specific provision for home study programs, that prescribed “books and other materials of instruction ... shall [be] supplied] without charge to the children of this state at the elementary and secondary levels out of funds |a9appropriated therefor by the legislature.”). Thus, our present ruling about the funding restriction in Article VIII, § 13(B) allows both Article VIII, § 1 and § 13(B) to be given effect. See Perschall, 96-0322 at 22, 697 So.2d at 255 (noting that even “in the event of conflict or inconsistency, provisions should be construed, if possible, to allow each provision to stand and be given effect.”).[19]
Because we must, whenever possible, give effect to each provision of the constitution, another of the defendants’ arguments fails. The defendants argue the delegates of the Constitutional Convention were generally in favor of aid to nonpublic schools. The defendants claim support from the fact that the convention delegates voted against reinstating a prohibition on aid to private schools. See Jackie Ducote, The Education Article of the Louisiana Constitution, 62 La.L.Rev. 117, 128-29 (2001) (noting that including from the 1921 Louisiana Constitution the “prohibition against the use of public funds for private *1053 or sectarian schools” was debated but defeated).
However, in drafting Article VIII, the convention delegates clearly understood they were drawing distinctions between public and nonpublic schools. For instance, during debate on proposed amendments, the purpose of Article VIII, § 13(A) was described as “simply constitu-tionalizing] a mandate to the legislature to prescribe free school books and materials to the children of this state and all schools.... It also, by the language used, guarantees to children in nonpublic schools the right to |snreceive these materials.”[20] In contrast, as to Article VIII, § 13(B), “[t]he purpose of having a minimum program at all is to insure that there are certain minimum standards in public education, met in all the school systems across the state.” Id. Additionally, some convention delegates proposed a separate section to Article VIII, which would have provided additional aid to nonpublic schools; this section would “take care of the fact that, historically, parochial and private schools in Louisiana have received some state allocation primarily in the form, for instance, of lunch money and so on.... We want to provide for the allocation of funds other than the minimum program. We would do that in Section (C).” Id.[21] This is significant for three reasons. First, if the convention delegates believed the MFP could be used to fund private schools under Article VIII, § 13(B), there would have been no need for the proposed Section (C). Second, as noted by the district court, this proposal was rejected by the convention delegates. Although the convention delegates were in favor of maintaining the benefits private and parochial schools received from the State, such as free text books, the convention delegates “[did] not intend or [did] not wish to open the door to other types of grants[,] other types of expenditures of public funds in the direction of private and sectarian operations.”[22] Third, if the convention | ^delegates were in favor of using MFP funds for nonpublic schools, then such terminology was known to the convention delegates and they could have simply employed such terminology, but they did not. Thus, while the explicit language of Article VIII, § 13(B) is the controlling reason for finding a restriction against MFP funds going to nonpublic schools, in the history of Article VIII, we find a sharply defined dichotomy: under Section 13(A), there is assistance made available to nonpublic schools, but that assistance is limited to textbooks and other instructional materials; under Section 13(B), the MFP funds are reserved for “parish and city school systems.”
The defendants also argue that the MFP is overfunded, in that the only funding *1054 required to be placed into the MFP is at Level One. Pointing out that Level Two contains incentive funds to local districts for surpassing their required contributions and that Level Three contains pay raise funds and “hold harmless” funds, the latter of which is slated to be discontinued, the defendants argue that the MFP contains funds not restricted by Article VIII, § 13(B). According to the defendants, many programs are not constitutionally required but, for convenience, are funded through the MFP. The defendants posit that over the years, by custom, the MFP has grown into “the central mechanism for planning the education budget of the state of Louisiana.” The Department’s Deputy Superintendent for Management of Finance testified that Level One is constitutionally required but that Level Two and Level Three are not constitutionally required. The defendants essentially argue that the state is now free to pay for nonpublic school tuition by drawing from what they argue are unrestricted MFP funds.
The fundamental error in this line of argument is that there are no unrestricted MFP funds. While we agree with the defendants that BESE and the legislature havej^vast flexibility and discretion in fashioning educational programs, once BESE and the legislature employ the unique MFP procedures of Article VIII, § 13(B) to fund programs, the constitutional restriction is clear: “The funds appropriated shall be equitably allocated to parish and city school systems.... ” (Emphasis added.) Whether, through custom, the number of items included within the MFP has grown over the years is of no moment. Because “[c]ustom may not abrogate legislation” (La.C.C. art. 2), we are not prepared to hold that custom can abrogate the Louisiana Constitution, the most fundamental law of our state. We hold, instead, that custom and convenience cannot contravene constitutional constraints.
As noted earlier, the discretion of BESE and the legislature is vast. However, we hasten to reiterate, we are not deciding the merits of the challenged programs. It is only at the stage in which BESE has invoked the MFP process for funding these programs and the legislature has nominally given its approval that this court is concerned. Pursuant to Article VIII, § 13(B), whatever discretion existed prior to the funds being dedicated to the MFP is no more; the state funds approved through the unique MFP process cannot be diverted to nonpublic schools or other nonpublic course providers according to the clear, specific, and unambiguous language of the constitution.
As a fallback position, the state defendants argue that even if we find a restriction in Article VIII, § 13(B) such that MFP funds cannot be diverted to nonpublic schools — a restriction we just have found — the SSEEP/voucher program does not violate the restriction. In support, the state defendants note this court’s ruling in Louisiana Assessors’ Retirement & Relief Fund, 05-2548 at 23, 986 So.2d at 19 (“to successfully challenge a legislative act as unconstitutional on its face, the challenger must establish that no circumstances exist under which the act would be Invalid.”). Citing La. R.S. 17:4016(0, the state defendants posit that a saving circumstance exists: “[e]ach scholarship recipient is a member of the local school system in which he attended or otherwise would be attending public school for that year.” As a consequence of this statute, the state defendants summarize what they believe to be a saving circumstance by which any restriction in Article VIII, § 13(B) does not apply to the SSEEP/voucher program: “the scholarship recipients are all public school children within the public educational system.”
*1055 However, the assertion that voucher students remain public school students for purposes of Article VIII, § 13(B) does not square with the law or the record. The record establishes that voucher students will physically attend a private school and that the state will directly pay the schools accepting vouchers. Recalling that Article VIII, § 13(B) restricts the use of MFP funds such that the funds cannot be diverted to nonpublic schools, the direct payment procedure violates Article VIII, § 13(B). Moreover, under the rules of constitutional construction, we are required to give a plain meaning to the phrase in Article VIII, § 13(B), which restricts the use of MFP funds to “parish and city school systems.” See Louisiana Municipal Association, 00-0374 at 5-6, 773 So.2d at 667. As commonly understood, the students of nonpublic schools are not students of “parish and city school systems.” Nonpublic schools are not owned or operated by “parish and city school systems,” as the state defendants themselves acknowledge. The reference in La. R.S. 17:4016 to “scholarship recipient [being] a member of the local school system in which he attended or otherwise would be attending public school”[23] does not change our analysis of what the phrase “parish and city school systems” in Article VIII, § 13(B) | ,¾plainly means.[24] Nor can that statute otherwise convert private school students into public school students for purposes of the Louisiana Constitution, because statutes “exist[ ] within the bounds of the Constitution, not vice versa.” State v. Louviere, 00-2085, p. 9 n. 7 (La.9/4/02), 833 So.2d 885, 894 n. 7.
Thus, we find no circumstance which would remove the SSEEP/voucher program funding approved through the MFP from the restriction in Article VIII, § 13(B), a restriction which prohibits diverting state MFP funds to nonpublic schools or other nonpublic course providers. Similarly, as the state has presented no saving circumstance for us to consider (and we envision none otherwise) that would exempt the early graduation program funding or the Course Choice Program funding from the prohibition against diverting MFP funds, we find the diversion of state funds for these programs also violates Article VIII, § 13(B).
Whether local funds are unconstitutionally diverted is a thornier question. There is no question that state MFP funds are diverted under the challenged legislative instruments and that the diversion of state MFP funds is unconstitutional. Here, there is a dispute as to whether local funds are actually diverted.
As previously indicated, the district court found that “[defendants are reducing the MFP allocations to public schools by equivalent amounts ... by considering the local funds when determining the MFP formula. Whether called a ‘diversion’ or something else, the result is the same.”
Regarding the question of whether local funds are diverted, some of the evidence contradicts the state defendants’ position that local funds are not diverted. Indeed, a review of the trial record reveals a multitude of state sources pointing toj^local revenue being expended under the SSEEP/voucher program. For example, the fiscal note to House Bill No. 976 (“HB 976”), enacted as Act 2, states that the cost of the voucher program would be shared by the state and local school districts. The 2012-2013 MFP Budget Letter contains a spreadsheet (entitled Table 5F), which in *1056 dicates that more than 50 percent of the costs of vouchers ($13,000,291 out of a total cost of $25,842,680) is paid from the “local share” of MFP funds.[25] A university economics professor with a background in analyzing the MFP was called as an expert by the state. The state’s expert testified: “There is no doubt, if you mean by ascertainable loss, something you can quantify, there is no doubt that, yes, as we said earlier, if a child moves to one of the private schools using the state money as it is now calculated, that school loses the MFP dollars and that school also loses that share of dollars based on that local revenue side.” (Emphasis added.)
In an effort to explain away such evidence, the state defendants point out that under Act 2: “The department shall transfer scholarship payments to each participating [voucher] school.” La. R.S. 17:4017(A). The state defendants contend the evidence characterizes the voucher program as having a cost to local school districts because that is simply a way of looking at the situation under a “formulaic treatment” of the total funding. However, according to the state defendants, the “formulaic treatment” does not actually reflect the transfer of any funds directly controlled by local school districts. According to the state defendants, the fact that no funds under direct local control are being diverted is reflected in Act 2, specifically the following provision: “No locally levied school district tax revenues L^shal! be transferred to any participating school located outside of the school district where the tax is levied or any participating nonpublic school within the district.” Id.
Nevertheless, it is unnecessary for us to resolve the thornier question of whether local funds are also diverted. It is undisputed that as structured by SCR 99, the MFP formula consists of an analysis and consideration of both state and local funds. This structure is intended, no doubt, to comport with the constitutional requirement of Article VIII, § 13(B) that the MFP “formula shall provide for a contribution by every city and parish school system.” Because we have found state MFP funds are unconstitutionally diverted to nonpublic entities, it is unnecessary for us to delve into whether the local component is also diverted. We therefore pretermit a determination on the issue of whether local funds are diverted. See Ring v. State, Department of Transportation and Development, 02-1367, p. 4 (La.1/14/03), 835 So.2d 423, 426 (“We have repeatedly and consistently held that courts should refrain from reaching or determining the constitutionality of legislation unless, in the context of a particular case, the resolution of the constitutional issue is essential to the decision of the case or controversy.”).

SCR 99 and the Effect of Law

The district court found both SCR 99 and Act 2 unconstitutional because of funding diversions. The district court rejected, however, the plaintiffs’ claims that SCR 99 violated the constitution’s procedural requirements for adoption and that SCR 99 was consequently invalid. More specifically, the plaintiffs claimed that SCR 99 was untimely introduced in the legislative session in violation of Article III, § 2(A)(3)(a) and SCR 99 did not receive the majority vote required by Article III, § 15(G).
|S7The common threshold for the plaintiffs’ claims of untimeliness and inadequate voting is whether SCR 99 was intended to have the effect of law. In a decision which we otherwise commend for its thoroughness and reason, the district court determined that SCR 99 was not intended to have the effect of law. However, on that *1057 issue, we disagree with the district court. As we explain further below, we break no new ground here in holding that no matter how a legislative instrument is designated, the judiciary’s role is to give effect to the content and substance of what the legislature has adopted.
We again take our instruction from the constitution. The specific threshold relating to the effect of law is contained in Article III, § 2(A)(3)(a), which in pertinent part provides:
No new matter intended to have the effect of law shall be introduced or received by either house after six o’clock in the evening of the twenty-third calendar day.
The word “matter” is not defined in Article III, § 2(A)(3)(a), and the absence of a restrictive definition is the first clue that “matter” may mean something broader than a bill. Although legislation is typically proposed as a “bill,” had the redactors of the constitution intended to limit the formalities required for legislation to apply only to an instrument designated as a “bill,” the redactors could easily have used the word “bill.” Indeed, in terms of legislative instruments, the constitution describes only a “bill,” “joint resolution,” and “concurrent, or other resolution” — only four legislative instruments in all. Because none of these four terms was used and the constitution refers to “matter,” we are left then to supply an ordinary meaning to the word “matter.” See La. R.S. 1:3. Reading the constitution as a whole, we note that “matter” refers to any of four legislative instruments.[26]
lasln sum, the designation of a matter as a bill or joint resolution, or concurrent or other resolution, is not the determinative factor in deciding whether compliance with Article III, § 2(3)(a) is necessary. Instead, the content and substance of the matter must be considered to determine the ultimate issue — whether the matter is “intended to have the effect of law.” La. Const, art. Ill, § 2(3)(a).
We must undertake a review of the content and substance of SCR 99. Before we do, however, we note that the state defendants argue that, of the 28 total pages comprising SCR 99, only the first three pages have any binding effect and urge us to give the remaining pages no effect. According to the state defendants, the legislature’s approval of the MFP is confined within the first three pages. Because the approval of the MFP was ostensibly the task before the legislature, the state defendants claim anything done beyond that task was mere surplus. Thus, we are essentially told we are free to ignore the overwhelming majority of the legislative instrument. We find such argument coun-terintuitive and, as a proposal for undertaking judicial review, we find it counterproductive. To put this into admittedly more colloquial terms, the ability to “see the forest through the trees” is generally recognized as important for a court to maintain a proper perspective when interpreting a legislative instrument. See, e.g., S.D. Warren Co. v. Maine Board of Environmental Protection, 547 U.S. 370, 384, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006). Here, we cannot limit our view to only 3 of the 28 trees comprising the forest, but must contemplate all 28 trees. Ignoring the entirety of SCR 99 would be the antithesis of what is required in the Louisiana civil law system, in which “legislation is the superior source of law.” La. C.C. art. 1, revision comment (a). We have previously observed that when reviewing a legislative instrument that is clearly a law, courts are bound to interpret the law according to the following principles:
|a9[I]t is presumed that every word, sentence, or provision in a law was intended *1058 to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were employed. Sultana Corporation v. Jewelers Mutual Insurance Company, 08-0360, p. 9 (La.12/3/03), 860 So.2d 1112, 1119. As a result, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found.
Colvin v. Louisiana Patient’s Compensation Fund Oversight Board, 06-1104, p. 6 (La.1/17/07), 947 So.2d 15, 19-20.
Logic dictates that if a court must review the entire text when interpreting a law, when a court is called on to determine whether a given legislative instrument is intended to have the effect of law, the court must also review the entire text. While the procedure employed to enact a legislative instrument is a factor to consider, it is ultimately through the text that a court can determine whether what the court examines “is a solemn expression of legislative will.” La. C.C. art. 2. Therefore, we will not confine our review to the first three pages, but instead we will review the entirety of SCR 99.
In the substance of SCR 99, we certainly find much about the legislature’s approval of the annual MFP formula developed by BESE. The first three pages, those to which the state defendants would have this court confine its review, contain recitations about the MFP development process, the goals of the MFP, and a statement that the MFP formula “is hereby approved .... ” As our editorial ellipsis indicates, however, the legislature did not stop there. The legislature indicated the MFP formula “is hereby approved to read as follows:” after which the legislature reproduced what purports to be the whole text of the MFP formula for the 2012-2013 school year. Just as the legislature continued to include text in SCR 99, so we continue our review of that text.
LnTo reiterate, we are reviewing the text to determine whether it reveals an “in-ten[t] to have the effect of law” pursuant to Article III, § 2(A)(3)(a). To that end, we note the defendants correctly argue, at this juncture, that the approval process for the MFP formula is a unique one, with its own specific procedures contained not within Article III, but described elsewhere in the constitution, i.e., in Article VIII, § 13(B).[27] We recall that part of the unique MFP approval process is the requirement for BESE to “annually develop and adopt a formula” and the requirement for the legislature to “annually appropriate funds sufficient to fully fund the current cost.” See La. Const, art. VIII, § 13(B). Therefore, the best indicator of whether the text of SCR 99 was intended to have the effect of law would be a provision for something beyond the annual MFP formula and funding for the 2012-2013 school year.[28] Thus, we filter our review of the *1059 remaining 25 pages of the text of SCR 99 accordingly.
When looking for text that does not concern the formula and funding for the 2012-2013 school year, we find the following:
The purpose of the Early High School Graduation Scholarship Program is to provide tuition and fee assistance to students graduating early from a public high school including state-funded Scholarship students thus enabling and encouraging the student to attend college in any public or private institution of higher education in Louisiana. This program will begin in Fiscal Year 2013-14.
J^SCR 99, XII(C) (emphasis added). Then, SCR 99 continues by describing funding allocations for this future early graduation program. For example, “[f]or students that graduate at the end of the eleventh grade, an amount shall be available equal to one-half of one year’s MFP state and local share per pupil allocation.” SCR 99, XII(C)(1) (emphasis added). In reproducing both of the excerpts about the early graduation program, we emphasize the words “will” and “shall” because these are indicators not of aspiration, not of option, but of requirement. See Colvin, 06-1104 at 6-7, 947 So.2d at 20, quoting La. R.S. 1:3 (“The word ‘shall’ is mandatory and the word ‘may’ is permissive.”). A legislative instrument which in mandatory terms constricts or compels action is intended to have the effect of law. See 20 P. Raymond Lamonica & Jerry G. Jones, Louisiana Civil Law Treatise: Legislative Law and Procedure § 7.1, p. 129 (2004) (“The ultimate purpose of legislative text to be given the effect of law is not simply to communicate ideas or information but to regulate behavior”).
Expressing a requirement, as evidenced by the inclusion of mandatory language in statutory interpretation cases such as Col-vin and in La. R.S. 1:3, is certainly one indicator pointing to the effect of law. However, we are tasked with ascertaining whether SCR 99 triggered constitutional requirements, so we again turn to the constitution itself.
In La. Const, art. Ill, § 2(A)(3)(a), there is no definition of the phrase “effect of law.” The same phrase is used elsewhere, as in La. Const, art. Ill, § 15(A), which indicates a public meeting requirement for “[a]ction on any matter intended to have the effect of law,” but which provides no definition for the phrase at issue. The phrase is also used in La. Const, art. X, § 10, and again in La. Const, art. X, § 48, and, in both instances, the civil service rules for certain state employees are elevated to | ^having the “effect of law.” Neither instance aids our search for the meaning of the phrase, “effect of law.” However, recalling the early graduation program calls for the appropriation of funds, we find a relevant meaning in the constitution for the phrase. In La. Const, art. Ill, § 16, we see that the power of appropriations is one of the specific powers of the legislature. In pertinent part, La. Const, art. Ill, § 16(A) provides: “Specific Appropriation for One Year. Except as otherwise provided by this constitution, no money shall be withdrawn from the state treasury except through specific appropriation, and no appropriation shall be made under the heading of contingencies or for *1060 longer than one year.” While we cannot find a more comprehensive definition, we can say with certainty that one among other meanings of the phrase, “effect of law,” is an appropriation. In turn, because SCR 99 purports to appropriate funds for the early graduation program, the text of SCR 99 compels the conclusion that SCR 99 was intended to' have the effect of law.
Notably, we conclude our search for the meaning of the phrase, “effect of law,” on finding that SCR 99 includes an appropriation, a power constitutionally belonging to the legislature that had purportedly been exercised here. Although the phrase “effect of law” suggests broader definitions are possible, we search no further for a definition because we are ever mindful of this court’s very limited role in this case. Furthermore, the consequences of our limitation bear special mention now that we find the text of SCR 99 was intended to have the “effect of law,” stemming from the fact SCR 99 contained a purported appropriation.
In SCR 99, we are faced with a purported appropriation that lies outside the MFP approval process, a specific process which accords to the legislature the responsibility to “annually appropriate funds sufficient to fully fund the current cost” |4Sof the MFP formula.[29] La. Const, art. VIII, § 13(B) (emphasis added). Whatever else might be said about the early graduation program in order to bring it within the ambit of the MFP approval process is not relevant. It cannot be denied that by declaring in SCR 99 “[t]his [early graduation] program will begin in Fiscal Year 2013-14”[30] and by also purporting to allocate funding for that program beyond “the current cost” of the 2012-2013 MFP as described by Article VIII, § 13(B), that the legislature has not confined itself to this year’s MFP approval process.[31]
In our analysis up to this point, we have found SCR 99 was a “matter,” the text of which was intended to have the effect of law. In our Article III, § 2(A)(3)(a) inquiry, the last threshold does not require us to draw upon the constitution so much as draw from the record. As it concerns the threshold of being a “new” matter for purposes of Article III, § 2(A)(3)(a), SCR 99 is the only legislative instrument describing the early graduation program and the appropriations for the program. The early graduation program is not mentioned in Act 2. Thus, we conclude SCR 99 was a new matter, the text of which was intended to have the effect of law.
Although we have emphasized the substance over the form in our analysis, we also note that the record shows some formal and procedural handling of SCR 99 comparable to that of legislative instruments formally designated as bills. ^Specifically, once lodged in the House, SCR 99 was referred to the Legislative Bureau.[32] The Legislative Bureau report *1061 ed no amendments and SCR 99 was passed to a third and final reading.
The procedural journey of SCR 99 did not go unnoticed by the district court, which noted: “Plaintiffs took great pains to show that SCR 99 followed the procedural path required of all legislative matters intended to have the effect of law.” However, the district court rejected the idea that this path was “positive proof,” after also noting the testimony of the Clerk of the House. As recounted by the district court, the Clerk of the House testified to the effect that “in at least eight of the last ten legislative sessions, the resolution to approve the formula to fund the MFP has failed to meet the procedural requirements for passage of a legislative matter intended to have the effect of law.” While we agree with the district court that the fact a matter travels the procedural path of matters intended to have the effect of law is not dispositive proof of intent, the path is part of the legislative history and is, therefore, a factor to be considered. As demonstrated in our earlier textual analysis, the usual rules of statutory interpretation should be applied whenever possible in determining whether a particular legislative instrument was intended to have the effect of law. Further, as we have recently held in two cases, both the text of a legislative instrument and the legislative history may be relevant when a court is tasked with discerning the intent of the legislature. See Livingston Parish Council on Aging v. Graves, 12-0232, p. 4 (La.12/4/12), 105 So.3d 683, 685-86; see also Moreno v. Entergy Corp., 12-0097, p. 12 (La.12/4/12), 105 So.3d 40, 48.
|45More specifically, in both Graves and Moreno, we explained that we start, as we have in this case, with the language of the legislative instrument itself. Graves, 12-0232 at 4, 105 So.3d at 685; Moreno, 12-0097 at 12, 105 So.3d at 48. Furthermore, if the instrument “is clear and unambiguous, the court’s inquiry into its intent and operation comes to an end.” Moreno, 12-0097 at 16 n. 7, 105 So.3d at 50 n. 7. However, when the text of the legislative instrument does not settle the issue, “[t]he occasion and necessity for the law, the circumstances under which it was enacted, concepts of reasonableness, and contemporaneous legislative history may also be considered in determining legislative intent.” Graves, 12-0232 at 4, 105 So.3d at 685-86.
Here, a measure of ambiguity is created by the fact that the legislative instrument, SCR 99, was not designated within its four corners as a bill (or later as an act) and the fact that such instrument nevertheless partially traveled the path of a matter intended to have the effect of law. Prudence and jurisprudence, therefore, dictate that we should consider the legislative history, as well as the text.
When we consider the text of SCR 99 contains mandatory language purporting to allocate funding to an early graduation program (a program established in SCR 99), and we consider SCR 99 travelled much the same path as a bill, we are compelled to conclude that SCR 99 was intended to have the effect of law. While we reiterate that we express no opinion on the validity of the legislature’s prior MFP approvals, the fact that SCR 99 took a path akin to matters intended to have the effect of law but most other MFP approvals did not travel that path, further supports our conclusion that SCR 99 was intended to have the effect of law.
*1062 | Á(iThe Constitutional Requirements for New Matters Intended to Have the Effect of Law
The constitutional consequences relating to the introduction in a legislative session of new matter intended to have the effect of law are significant. The most basic consequence is the calendaring requirement we noted earlier: “No new matter intended to have the effect of law shall be introduced or received by either house after six o’clock in the evening of the twenty-third calendar day.” La. Const, art, III, § 2(A)(3)(a).
Here, SCR 99 was introduced in the Senate on May 7, 2012, which was the fifty-seventh calendar day of the regular session. Therefore, the introduction of SCR 99 was untimely. Because the introduction of SCR 99 was untimely, its reception on May 21 by the House, was also untimely, measured against the same “twenty-third calendar day” requirement of Article III, § 2(A)(8)(a).
Another constitutional requirement also relates to calendaring. Specifically:
No matter intended to have the effect of law, except a measure proposing a suspension of law, shall be considered on third reading and final passage in either house after six o’clock in the evening of the fifty-seventh legislative day or the eighty-second calendar day, whichever occurs first, except by a favorable record vote of two-thirds of the elected members of each house.
La. Const, art. Ill, § 2(A)(3)(a).
SCR 99 was considered for final passage in the House on June 4, 2012, which was the eighty-fifth calendar day of the session. At that juncture, SCR 99 was subject to a two-thirds record vote because the eighty-second calendar day threshold of Article III, § 2(A)(3)(a) had already passed. The record reflects no two-thirds vote was taken by the House for consideration of SCR 99. Thus, SCR 99 was not properly considered.
|47Lastly, but importantly, the constitution imposes a requirement for a “favorable vote of at least a majority of the members elected to each house” before a matter can “become law.” La. Const, art. Ill, § 15(G). The specific matter being referred to in Article III, § 15(G) is a “bill.” Yet, although SCR 99 was not designated as a bill, as we have previously found, it was intended to have the effect of law. Thus, we see no reason why a legislative instrument intended to have the effect of law should not be held to the constitution’s voting requirements for enacting law, simply because the instrument lacks the designation of being a “bill.” We are persuaded of the correctness of our conclusion by the following reasoning, which draws upon the United States Constitution:
A concurrent resolution ... makes no binding policy; it is “a means of expressing fact, principles, opinions, and purposes of the two Houses,” Jefferson’s Manual and Rules of the House of Representatives 176 (1983), and thus does not need to be presented to the President. It is settled, however, that if a resolution is intended to make policy that will bind the Nation and thus is “legislative in its character and effect,” S.Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897) — then the full Article I requirements must be observed. For “the nature or substance of the resolution, and not its form, controls the question of its disposition.” Ibid.
Bowsher v. Synar, 478 U.S. 714, 756, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring) (emphasis added).
Measured by the requirement of the state constitution for a “favorable vote of at least a majority of the members elected to each house,” (Article III, § 15(G)), the *1063 vote on SCR 99 was insufficient. The House is composed of 105 representatives. Therefore, 53 representatives constitute a majority of the representatives elected. In turn, and pursuant to Article III, § 15(G), any matter intended to have the effect of law would have required 53 votes to pass. The House vote on SCRl4R99 was 51 “yeas” and 49 “nays”; five representatives were absent. While the 51 votes in favor of SCR 99 represented a majority of the members then present, the total favorable vote fell two votes short of the “majority of the members elected ” as required by Article III, § 15(G) (emphasis added).

House Bill No. 976 Enacted as Act 2 and the One-Object Rule

In their devolutive appeal, the plaintiffs assigned as error the district court’s finding that HB 976, enacted as Act 2, does not violate the one-object requirement of La. Const, art. Ill, § 15(A). While, ordinarily, a ruling by this court that Act 2 is unconstitutional because it diverts state MFP funds to nonpublic entities might pretermit the consideration of additional constitutional challenges to the Act, Act 2 contains a severability clause. 2012 La. Acts 2, § 1; see La. R.S. 17:4025. As a result of that clause, and by virtue of La. R.S. 24:175,[33] we must examine those provisions of the Act which do not involve the diversion of MFP funds (and thus are not constitutionally infirm on that ground), essentially severing the unconstitutional provisions from those provisions we have not found unconstitutional.[34] We perform this severance, to determine whether, as the plaintiffs contend, the one-object rule is violated.
149The one-object rule is contained within La. Const, art. Ill, § 15(A), which provides in pertinent part: “Every bill, except the general appropriation bill and bills for the enactment, rearrangement, codification, or revision of a system of laws, shall be confined to one object.” The provision first appeared in the Louisiana Constitution of 1845 and has been incorporated, with one exception, in every constitution enacted since that date.[35]
The one-object requirement is a restraint on the legislature, aimed at preventing the dilution of the majority vote *1064 through “logrolling,” which is the “practice of procuring diverse and unrelated matters to be passed on as one ‘omnibus’ through the consolidated votes of the advocates of each separate measure when perhaps no single measure could have passed on its own merits,” and through “riders,” or the attachment of undesirable provisions “on bills certain to be passed because of their public popularity or desirability.” Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 17.1 at 7-8 (7th ed. 2009). As explained in State v. Dooley, 261 La. 295, 259 So.2d 329, 333 (1972):
The single object requirement is for the purpose of giving notice to the Legislature and of restricting a legislative act so that a legislator will not for the purpose of voting on the bill have to weigh the validity of two objects foreign to each other. Only matters related and germane to the object and purpose of the legislation can be included. Otherwise a legislator would perhaps be required to balance the advantages of one object against the disadvantages of a foreign object, and laws actually considered bad by a majority of legislators could be enacted by tacking them onto, and making them a part of, acceptable laws dealing with an alien object.
| BnThe “object” of a bill has been variously defined as the aim or purpose of the enactment, its general purpose, the matter or thing forming the groundwork of the bill. See Wall v. Close, 203 La. 345, 14 So.2d 19, 26 (1943), quoting Airey v. Tugwell, 197 La. 982, 3 So.2d 99, 102 (1941). In its constitutional sense, then, the term “object” is very broadly defined. See Dooley, 259 So.2d at 333. Thus, while the constitution requires unity of object in legislation, it does not restrict the permissible breadth of a bill. In effect, a bill may be as broad as the legislature chooses so long as all of its provisions “have a natural connection and reasonably relate, directly or indirectly, to one general and legitimate subject of legislation.” Bazley v. Tortorich, 397 So.2d 475, 485 (La.1981). As this court has explained:
In deciding whether a statute of the Legislature violates a constitutional provision which prohibits an act from embracing more than one object, courts must keep in mind its main purpose as disclosed by its language. It matters not how comprehensive the act may be or how numerous its provisions; it does not _ violate such a constitutional provision if its language, reasonably construed, shows that it has but one main, general object or purpose, and if nothing is written into it except what is naturally connected with, and is incidental or germane to, the one purpose or object.
Wall, 14 So.2d at 26.[36] Thus, the constitution does not prohibit the legislature from addressing several branches of one subject or from providing in one bill the necessary means for carrying out its object. State v. Cooper, 382 So.2d 963, 965 (La.1980). As long as the parts of a bill are reasonably related and have a natural connection to the general subject matter of the legislation, the bill is considered to have one *1065 object. Doherty v. Calcasieu Parish School Bd., 93-3017 (La.4/11/94), 634 So.2d 1172, 1176.
In examining a bill to determine whether it comports with the one-object requirement of La. Const, art. Ill, § 15(A), we begin with the presumption that a legislative instrument is constitutional and will only be stricken when clearly repugnant to the constitution.[37] Doherty, 634 So.2d at 1174; Louisiana Public Facilities Authority v. Foster, 01-0009, p. 14 (La.9/18/01), 795 So.2d 288, 298, quoting Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners, & Citizens of the State of Louisiana, 529 So.2d 384, 388 (La.1988) (“[I]t is not enough [for a person challenging a statute] to show that the constitutionality [of the statute] is fairly debatable, but, rather, it must be shown clearly and convincingly that it was the constitutional aim to deny the legislature the power to enact the statute.”). Consistent with this precept, La. Const, art. Ill, § 15(A) must be construed broadly, rather than narrowly, with the view of effectuating, not frustrating, the legislative purpose. Louisiana Municipal Association v. State ex rel. Foster, 99-2952, p. 6 (La.App. 1 Cir. 6/23/00), 762 So.2d 1177, 1181, citing Ricks v. Department of State Civil Service, 200 La. 341, 8 So.2d 49, 54 (1942).
The task of this, or any, court in considering whether a bill comports with the one-object requirement of La. Const, art. Ill, § 15(A) is to first identify the main purpose or object of the bill, and then to examine each provision thereof to determine whether its parts have a natural connection and reasonably relate, directly or | B2indirectly, to that purpose. See Forum for Equality PAC, 04-2477 at 24, 893 So.2d at 732; see also Bazley, 397 So.2d at 485.
In connection therewith, we note that in addition to requiring that every bill[38] be confined to one object, La. Const, art. Ill, § 15(A) directs: “Every bill shall contain a brief title indicative of its object.” The purpose of this requirement is to give the legislature and the public fair notice of the scope of legislation and to defeat the deceitful practice of misleading the legislature into the passage of provisions not indicated by the title of the bill. Bazley, 397 So.2d at 485. As we have explained: “The title of an act of the Legislature is of the nature of a label, the purpose of which is to give notice of the legislative intent and purpose to those interested in, or who may be affected by, the terms of the act, and to prevent surprise and fraud upon members of the Legislature.” Airey, 3 So.2d at 102. In this case, there is no contention that the title of HB 976 (the genesis of Act 2) is not indicative of the bill, or that it omits provisions contained in the body of the bill (and thus violates the indicative-title requirement of La. Const, art. Ill, § 15(A)). Given the admitted coextensiveness of the body of the bill and its title, which is, as we have explained, in the nature of a label, it is therefore appropriate to look first to the title for guidance as to the object or purpose of HB 976. See Forum for Equality, 04-2477 at 25, 893 So.2d at 733 (“[I]n our search for the *1066 [bill’s] intended object, we begin with the title the Legislature adopted[.]”).
An examination of the title of HB 976 suggests that the object or purpose of the bill is to provide expanded choice in schools to the citizens of this state. To this end, the title provides:
_bAN ACT
To amend and reenact R.S. 17:22(7)(a), 158(A)(1), 3973(3) through (6), 3981(4), 3982(A)(1)(a) and (2) and (B), 3983(A)(2)(a)(I), (3)(a), and (4)(a), (b), and (d), (B)(2), and (D), 3991(B)(3) and (13), (C)(l)(c)(iv) and (6), (D)(2)(a)(I) and (H), 3992(A)(1), 3995(A)(l)(introductory paragraph) and (c) and (4)(a), 3996(C) and (G), 3998, 4001(A) and (C)(1) and (2), and Part I of Chapter 43 of Title 17 of the Louisiana Revised Statutes of 1950, to be comprised of R.S. 17:4011 through 4025, to enact R.S. 17:10.5(F), 3973(2)(b)(vi) and (7), 3974, 3981(7) and (8), 3981.1, 3981.2, 3982(A)(3), 3983(A)(2)(a)(iii) and (d) and (3)(d) and (E)(3), 3992(D), and Part VII of Chapter 42 of Title 17 of the Louisiana Revised Statutes of 1950, to be comprised of R.S. 17:4002.1 through 4002.6, and to repeal R.S. 17:3991(B)(9) and 3996(A)(16) and (B)(4), relative to school choice.... [Emphasis added.]
In this introductory clause, in which all of the statutory provisions encompassed by the bill are collected and listed numerically, the legislature identifies the general subject matter of the enumerated provisions — school choice. In other words, in this first clause all of the affected statutes are described by the legislature as falling under one general subject — “relative to” providing expanded “school choice.” Thereafter, the title continues, setting forth and providing fair notice of the means through which this object of providing expanded school choice is to be accomplished. The subsequent clauses describe the content of the numerically enumerated provisions:
to provide relative to reports by the superintendent of education; to provide relative to the Student Scholarships for Educational Excellence Program; to provide relative to program eligibility and participation requirements for students and schools; to provide relative to selection and enrollment of eligible students; to provide relative to funding and payments to eligible schools including eligible nonpublic schools; to provide for reports; to provide for the submission of petitions by parents requesting that a school be transferred to the Recovery School District under certain conditions; to require rules and regulations to be adopted by the State Board of Elementary and Secondary Education for the petition process; to change charter proposal submission time lines; to provide a mechanism for Type 1 and Type 3 charter schools to covert to a Type 2 charter school under certain conditions; to authorize the state board to allow the state superintendent of education and the superintendent of the Recovery School District to amend the charter of |MType 5 charter schools to accommodate a unified enrollment system; to modify the initial charter period; to provide for charter school admission requirements; to allow foreign language immersion schools to establish special admission standards; to provide for the qualifications of teachers; to provide relative to the evaluation of charter school teachers and other school employees; to provide relative to teacher certification requirements; to remove the requirement that charter schools comply with laws relative to the length of the school year; to provide for the Course Choice Program; to provide for program definitions and funding; to provide for the powers of the State *1067 Board of Elementary and Secondary Education and local public school systems relative to course providers; to provide relative to entities that authorize charter schools; to provide for certification of certain state agencies and nonprofit corporations as charter au-thorizers; to provide relative to the responsibilities of the State Board of Elementary and Secondary Education with respect to certification of such authoriz-ers; to provide relative to requirements, powers, responsibilities, and limitations of such authorizers; to provide relative to schools whose charter is authorized by such entities, including matters related to funding for such schools; to provide for procedures, processes, fees, and regulations; to prohibit persons who have been convicted of any crime defined as a felony from being a local charter authorizer, member, officer or director of a charter school; to require certain local charter authorizers to comply with the Open Meetings Law, the Public Records Law, and the ethics code; and to provide for related matters.
Thus, the title of the bill is structured so as to suggest, in the first clause, a unifying object of the bill (that being to provide “relative to school choice”), and in the subsequent clauses, the details through which that object is to be accomplished.[39] Isr,Based on an examination of the title of HB 976, therefore, one could logically conclude that the object of the bill is providing expanded “school choice.”[40]
However, we have recognized that the object of a bill is not identified by examining its title alone, but also by examining its body. See O’Dell, 218 So.2d at 319, quoting Peck v. City of New Orleans, 199 La. *1068 76, 5 So.2d 508, 515 (1941); see also Wall, 14 So.2d at 26 (We “examine the title and body of Act 111 of 1942 in order to ascertain the purpose or aim of the statute.”). In this connection, we note that HB 976 amends or reenacts twenty-seven statutes, enacts twenty new statutory provisions, and repeals three statutory provisions. An analysis of its provisions, though numerous, demonstrates that expanding options for choice in schools is the matter “forming the groundwork” of each of its provisions and that nothing is written into the bill “except what is naturally connected with, and is incidental or germane to” this main, general purpose, or unifying object. Wall, 14 So.2d at 26.
Nevertheless, the plaintiffs argue that HB 976, in fact, contains plural objects. To answer this argument, we must examine each of those alleged objects and determine whether the identified provision is neither naturally connected nor reasonably related, directly or indirectly, to the stated purpose of HB 976 — expanding school choice.
IsfiOne of the alleged separate objects of the legislation the plaintiffs identify is found at the beginning of HB 976. HB 976 starts by enacting a new subsection of law, La. R.S. 17:10.5(F). The existing subsections of this statute (Subsections A through E) define what constitutes a failing school and provide the basis and procedure for transferring these schools from local school boards to the Recovery School District. HB 976 adds an additional mechanism — parent petition — for transfer of a failing school to the Recovery School District. The plaintiffs’ contention that this provision is unrelated to any other provision of the bill or to the matter that forms its object is without merit. The provision is reasonably related and incidental to the objective of providing expanded educational options and greater school choice. It provides an additional means for effectuating that choice.
Next, the plaintiffs point out that HB 976 amends La. R.S. 17:22, which pertains to the functions and duties of a superintendent of schools. HB 976 adds a requirement that a superintendent report annually on the implementation of a total system of choice. See La. R.S. 17:22(7)(a). While the plaintiffs maintain that this is a separate object of the legislation, in fact, the reporting requirement is naturally connected and necessary to the implementation of the objective of providing greater school choice.
The plaintiffs contend that a third separate object of the bill is found in the provision which amends La. R.S. 17:158, entitled “School buses for transportation of students; employment of bus operators; alternate means of transportation; improvement of school bus turnarounds.” This amendment exempts public schools from providing free transportation to students enrolled in nonpublic schools. See La. R.S. 17:158(A)(1). Although the plaintiffs maintain this provision evidences a completely separate and distinct object, the district court, in reviewing same, found |s7that it is reasonably related and has a natural connection to the object of providing school choice since “amendment of the school transportation statute was necessary to exempt local districts from having to fund transportation for students enrolled in the Act 2 scholarship program. Without this amendment, the local school systems may have been required to bus students to non-public schools, potentially rendering the passage of Act 2 unconstitutional.” In other words, the stated objective of providing school choice could not have been adequately accomplished without the inclusion of this provision. It is clearly a matter incidental and germane to the object of HB 976.
*1069 According to the plaintiffs, a fourth object of HB 976 is found in its revisions of the Charter School Demonstration Programs Law, La. R.S. 17:3971, et seq. HB 976 amends ten sections of the charter school law and adds three sections. Basically, the bill amends La. R.S. 17:3973 by creating a new type of charter school — a Type IB charter — which consists of a new school or a pre-existing public school operated under a charter between a nonprofit corporation and a local charter authorizer. It enacts La. R.S. 17:3974 to provide that if certain persons associated with a local charter authorizer have been convicted of a felony, BESE shall not certify the local charter authorizer. It amends La. R.S. 17:3981 to allow chartering groups to propose several charter schools through a single application and directs the Department to actively recruit chartering groups that offer courses addressing regional workforce needs. See La. R.S. 17:3981(4), (7) & (8). In addition, HB 976 enacts two new sections of law: (1) La. R.S. 17:3981.1, which establishes a process for certifying entities as local charter school authorizers, and (2) La. R.S. 17:3981.2, which provides for the powers and duties of local charter authorizers. HB 976 continues by amending La. R.S. 17:3982 to change the time lines for evaluating charter school applications; and La. |ssR.S. 17:3983 to further provide with respect to the new Type IB charter schools. The bill amends La. R.S. 17:3991 relative to the admission requirements of charter schools and the qualifications and evaluations of charter school personnel. In the process, the bill removes the requirement that at least 75 percent of the instructional staff employed by a charter school (with the exception of Type 5 charter schools) be certified and replaces it with a requirement that instructional staff have at least a baccalaureate degree. Finally, HB 976 amends La. R.S. 17:3992, 3995, 3996, 3998 and 4001, which address the revision and renewal of charters, funding, school exemptions, reports and the charter school start-up loan fund, respectively.
The plaintiffs’ attack on these sections of HB 976 is two-fold. First, they maintain that charter school law is a separate object in and of itself and, thus, any changes thereto should be confined to a single bill. Second, they argue that provisions such as those allowing charter schools to employ noneertified teachers and prohibiting BESE from certifying a local charter au-thorizer if certain persons connected with that authorizer have been convicted of a felony are not reasonably related to the objective of providing expanded school choice. Indeed, the plaintiffs argue that removing a certification requirement for instructional staff at charter schools undercuts rather than promotes the goal of improving education by providing greater choice.
Certainly, the relative merits of any statute removing certification requirements for instructional staff at charter schools is a debatable issue. However, the wisdom of such a provision is a concern more properly brought to the legislature. The issue that concerns this court is not whether the provision is advisable, but whether the inclusion of such a provision in HB 976 is naturally connected and reasonably related, directly or indirectly, to the goal of expanding school choice.
|fiaAs the state defendants point out, charter schools are an established vehicle of school choice in this state. As such, charter schools and their operations have a logical and commonsense connection to any legislation seeking to address expanding school choice. Statutes designed to improve the charter school option by reforming the approval process, admission standards, teacher evaluations and certification are a logical corollary of and incidental to a *1070 bill, the object or unifying principle of which is to expand school choice.
In the final analysis, the plaintiffs’ insistence that the charter school provisions of HB 976 constitute a separate object is based on the unstated premise that because the legislation deals with different types of schools, each type of school must necessarily represent a different object. However, as we have noted, HB 976 is concerned with, and has the objective of, providing greater school options; the provision of education through different kinds of schools is a rationally related and necessary incident of this object. As this court has explained:
The constitutional requirement that a statute shall embrace only one object does not mean that each and every means necessary to accomplish an object in the law must be provided for by a separate act relating to it alone. A statute that deals with several branches of one subject does not thereby violate the constitutional provision.
Wall, 14 So.2d at 25, quoting State ex rel. Supervisor of Public Accounts v. Terrell, 181 La. 974, 160 So. 781, 782 (1935). The objective underlying HB 976 provides a reasonable basis for including different types of schools within its ambit.
Next, the plaintiffs contend that a separate object of HB 976 lies in the provisions creating the Course Choice Program. HB 976 enacts La. R.S. 17:4002.1 through 4002.6. These statutes authorize postsec-ondary educational institutions, online or virtual course providers, and business and industry to provide courses for students enrolled in public schools, certain nonpublic schools, and approved home |fi0study programs. They define the duties of BESE relative to the entities authorized to offer courses and provide for funding through the MFP.
While the plaintiffs maintain the Course Choice Program should have appeared in a stand-alone bill, and should not have been included in a bill which provides for the transfer of schools to the Recovery School District and amendments to the charter school law, this argument fails for the reasons stated above. The one-object requirement of the constitution “does not prohibit the legislature from dealing with several branches of one subject or from providing in one act the necessary means for carrying out its object.” Cooper, 382 So.2d at 965. In this case, the creation of the Course Choice Program and the enactment of provisions supplying the means to institute same are naturally connected and reasonably relate to the objective of providing expanded choice to students in Louisiana’s schools.
Finally, the plaintiffs maintain that HB 976’s expansion of the SSEEP constitutes a separate object. HB 976 amends Part I of Chapter 43 of Title 17 of the Revised Statutes, entitled “School Choice Scholarships.” The amended provisions, La. R.S. 17:4011 through 4025, allow scholarships for students enrolled in nonpublic schools. Provisions which allocate money from the MFP for funding are included in the amendments.
While the plaintiffs argue the SSEEP represents a separate object, in fact they do not seriously dispute that the provisions thereof are directly related to and further the legislative objective of HB 976 — providing greater school choice. Rather, the plaintiffs focus their objections on the length and breadth of the bill, alleging the objective of expanding school choice is simply too broad and amorphous to constitute a meaningful objective and that the sheer number of statutes involved in the bill is indicative of multiple objects. In this respect, the plaintiffs confuse the complexity | r,,and length of the bill with its object, an approach this court rejected years ago when it cautioned: “If all the parts of a *1071 [legislative instrument] have a natural connection and reasonably relate, directly or indirectly, to one general and legitimate subject of legislation, the [legislative instrument] is not considered as being open to the objection of plurality, no matter how extensively it deals with the details looking to the accomplishment of the main legislative purpose.” See Bazley, 397 So.2d at 485.
The purpose of the constitution’s one-object requirement is, as we have said, to restrict a legislative act so that legislators will not have to consider the validity of two unrelated objects in deciding how to vote on a bill. Bazley, 397 So.2d at 485. Clearly, then, a bill cannot contain incongruous and unrelated matters. Cooper, 382 So.2d at 965. Our review of the provisions of HB 976 convinces us, consistent with the conclusion of the district court, that the bill does not contain incongruous and unrelated matters, but rather that its provisions are naturally connected with, and incidental or germane to the main objective of, expanding educational choice.
In reaching this conclusion, we remain mindful of the United States Supreme Court’s caution, cited approvingly a century ago by this court in St. Anna’s Asylum v. Parker, 109 La. 592, 33 So. 613, 616 (1903), that given the state constitution’s failure to specify the degree of particularity necessary to comply with the one-object rule:
[T]he courts should not embarrass legislation by technical interpretations based upon mere form or phraseology. The objections should be grave, and the conflict between the statute and the Constitution palpable, before the judiciary should disregard a legislative enactment upon the sole ground that it embraced more than one object, or if but one object, that it was not sufficiently expressed in the title.
Inhabitants of Montclair Tp. v. Ramsdell, 107 U.S. 147, 155, 2 S.Ct. 391, 27 L.Ed. 431 (1883). In this case, the plaintiffs have simply failed to establish that such a grave and palpable conflict exists between HB 976 and the one-object requirement of La. Const, art. Ill, § 15(A).
| ^CONCLUSION
We conclude as we began, by recognizing the limited judicial role in this matter, which is to resolve constitutional questions. We do not evaluate the merits of the SSEEP/voucher program and other similar programs per se. We hold that by their express terms, SCR 99 and Act 2 unconstitutionally divert MFP funds to nonpublic entities in violation of La. Const, art. VIII, § 13(B), which requires state MFP funds to be allocated equitably to “parish and city school systems.” We also hold that, although SCR 99 was a new matter intended to have the effect of law, SCR 99 did not satisfy all that the constitution requires of a matter intended to have the effect of law. SCR 99 was not timely introduced or considered in the legislative session and the final vote on SCR 99 was insufficient to enact a matter intended to have the effect of law. Because our holding differs from that of the district court regarding the effect of law intended by SCR 99, we reverse the contrary holding of the district court. Accordingly, we render- judgment declaring SCR 99 was void from the outset. On a related topic, we note that because we have found SCR 99 was intended to have the effect of law, SCR 99 was not validly enacted.
Finally, once the unconstitutional provisions of Act 2 are analytically severed, we hold that the legislature did not violate the constitution’s one-object rule. That portion of the district court’s judgment is affirmed.
*1072 AFFIRMED IN PART; REVERSED IN PART, AND RENDERED.
VICTORY, J., concurs.
GUIDRY, J., dissents and assigns reasons.

. Later intervening in the district court as parties defendant were Kendra Palmer, et al., whose arguments in both the district court and in this court are aligned with the Department and BESE. For ease of reference and unless otherwise noted, this opinion refers to all parties so aligned as defendants.

. The district court later dismissed the injunc-tive relief on an exception of lack of subject matter jurisdiction. The court of appeal and this court denied writs. Louisiana Federation of Teachers v. State, 12-1822 (La.8/15/12), 95 So.3d 1058.

.Separately, the Lafourche Parish School Board was granted leave to intervene and joined as a party plaintiff.

. In pertinent part, La. Const, art. VIII, § 13 provides:
(C) Local Funds. Local funds for the support of elementary and secondary schools shall be derived from the following sources:
First: Each parish school board, Orleans Parish excepted, and each municipality or city school board actually operating, maintaining, or supporting a separate system of public schools, shall levy annually an ad valorem maintenance tax not to exceed five mills on the dollar of assessed valuation on property subject to such taxation within the parish or city, respectively.
Second: The Orleans Parish School Board shall levy annually a tax not to exceed thirteen mills on the dollar of the assessed valuation of property within the city of New Orleans assessed for city taxation, and shall certify the amount of the tax to the governing authority of the city. The governing authority shall have the tax entered on city tax rolls. The tax shall be collected in the manner, under the conditions, and with the interest and penalties prescribed by law for city taxes. The money thus collected shall be paid daily to the Orleans Parish School Board.
Third: For giving additional support to public elementary and secondary schools, any parish, school district, or subschool district, or any municipality or city school board which supports a separate city system of public schools may levy an ad valo-rem tax for a specific purpose, when authorized by a majority of the electors voting in the parish, municipality, district, or sub-district in an election held for that purpose. The amount, duration, and purpose of the tax shall be in accord with any limitation imposed by the legislature.
(D)(1) Municipal and Other School Systems. For the effects and purposes of this Section, the Central community school system and the Zachary community school system in East Baton Rouge Parish, and the municipalities of Baker in East Baton Rouge Parish, Monroe in Ouachita Parish, and Bogalusa in Washington Parish, and no others, shall be regarded and treated as parishes and shall have the authority granted parishes. Consistent with Article VIII of this constitution, relevant to equal educational opportunities, no state dollars shall be used to discriminate or to have the effect of discriminating in providing equal educational opportunity for all students.
All three petitions expressly invoked La. Const, art. VIII, § 13(C); only the petition filed by the Louisiana Federation of Teachers and its related plaintiffs expressly invoked La. Const, art. VIII, § 13(D).

. La. Const, art. Ill, § 15(A) and (C) provide:
(A) Introduction; Title; Single Object; Public Meetings. The legislature shall enact no law except by a bill introduced during that session, and propose no constitutional amendment except by a joint resolution introduced during that session, which shall be processed as a bill. Every bill, except the general appropriation bill and bills for the enactment, rearrangement, codification, or revision of a system *1040 of laws, shall be confined to one object. Every bill shall contain a brief title indicative of its object. Action on any matter intended to have the effect of law shall be taken only in open, public meeting.
[[Image here]]
(C) Germane Amendments. No bill shall be amended in either house to make a change not germane to the bill as introduced.

. La. Const, art. Ill, § 2(A)(3)(a) provides:
All regular sessions convening in even-numbered years shall be general in nature and shall convene at noon on the second Monday in March. The legislature shall meet in such a session for not more than sixty legislative days during a period of eighty-five calendar days. No such session shall continue beyond six o’clock in the evening of the eighty-fifth calendar day after convening. No new matter intended to have the effect of law shall be introduced or received by either house after six o'clock in the evening of the twenty-third calendar day. No matter intended to have the effect of law, except a measure proposing a suspension of law, shall be considered on third reading and final passage in either house after six o'clock in the evening of the fifty-seventh legislative day or the eighty-second calendar day, whichever occurs first, except by a favorable record vote of two-thirds of the elected members of each house.

. La. Const, art. Ill, § 15(G) provides:
Majority Vote; Record Vote. No bill shall become law without the favorable vote of at least a majority of the members elected to each house. Final passage of a bill shall be by record vote. In either house, a record vote shall be taken on any matter upon the request of one-fifth of the elected members.

. Joint Rule 20(A)(l)(a)(iii) provides, in pertinent part:
(l)(a) During any regular session convening in an odd-numbered year, no matter intended to have the effect of law ... shall be introduced, considered, or adopted unless it meets one of following criteria:
(iii) The resolution to approve the formula to fund the Minimum Foundation Program.

. La. Const, art. VI, § 29(A) provides:
Sales Tax Authorized. Except as otherwise authorized in a home rule charter as provided for in Section 4 of this Article, the governing authority of any local governmental subdivision or school board may levy and collect a tax upon the sale at retail, the use, the lease or rental, the consumption, and the storage for use or consumption, of tangible personal property and on sales of services as defined by law, if approved by a majority of the electors voting thereon in an election held for that purpose. The rate thereof, when combined with the rate of all other sales and use taxes, exclusive of state sales and use taxes, levied and collected within any local governmental subdivision, shall not exceed three percent.

. La. Const, art. V, § 5(D) provides this court with appellate jurisdiction when "a law or ordinance has been declared unconstitutional.”

. See La. Const, of 1974, art. Ill, § 16(C), describing the legislature’s role in general appropriations as: "The general appropriation bill shall be itemized and shall contain only appropriations for the ordinary operating expenses of government, public charities, pensions, and the public debt or interest thereon.”

. This court has earlier described the constitutional relationship between BESE and the legislature as "a symbiotic relationship in which neither the Legislature nor BESE has exclusive authority over public elementary and secondary education.” Aguillard v. Treen, 440 So.2d 704, 709 (La.1983).

.When asked at oral argument to explain the MFP, counsel for the state defendants responded that the time allotted for oral argument was inadequate for an explanation. Our evaluation of the various documents in the record confirms the complexity suggested by counsel’s response.

. Other factors come into play in Level One, such as different weightings for pupils with exceptionalities, whose education is therefore likely to cost more.

. This Handbook is contained in the record as a joint exhibit.

. The record establishes that a very small number of schools eligible to receive voucher payments are actually public schools. The overwhelming majority of voucher-eligible schools are nonpublic schools.

. La. R.S. 17:4017(A) provides:
The department shall transfer scholarship payments to each participating school on behalf of the responsible city or parish school district. No locally levied school district tax revenues shall be transferred to any participating school located outside of the school district where the tax is levied or any participating nonpublic school within the district.

. The evidentiary record shows that the MFP formula and approval process have been used to fund various public schools. However, and as the parties concede, the instant case involves MFP funding to nonpublic schools. Therefore, the breadth of the term “parish and city school systems” in Article VIII, § 13(B) is not a question presented here, and we express no opinion on the matter.

. We also note that Article VIII addresses other matters related to the "education of the people of the state.” La. Const, art. VIII, § 1. For example, Section 2 addresses "State Superintendent of Education”; Section 3 addresses "State Board of Elementary and Secondary Education”; Section 4 addresses "Approval of Private Schools”; Section 5 addresses "Board of Regents”; Section 6 addresses "Board of Supervisors for the University of Louisiana System”; and Section 14 addresses "Tulane University.” All of these sections address matters outside of "maintain[ing] a public educational system.” La. Const, art. VIII, § 1.

. Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Volume IX, 87th day, Nov. 16, 1973, 2442 (remarks of Delegate I. Jackson Burson).

. The reference is to a proposed Section (C), which is a different provision than La. Const, art. VIII, § 13(C) as ultimately adopted. The proposed Section (C) would have provided:
Other Funds. Any funds for the education and benefit of the school children of Louisiana from any other source shall be distributed in the manner determined by the State Board of Elementary and Secondary Education, subject, however, to the terms of the laws appropriating or governing such funds.
Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Volume II, Journal and Calendar, 87th day, Nov. 16, 1973, p. 839.

.Id. at 2445 (remarks of Delegate Robert Aertker); see Id. at 2446-47 (remarks of Del. Burson) ("the overwhelming verdict of this convention [is] that the constitution should not be either pro or con any state aid to private schools beyond what we know has been traditionally been given”).

. La. R.S. 17:4016(C).

. This is not to say that a statute can never shed light on the meaning of a constitutional provision, as might be the case for statutes that predate a constitutional provision on the same topic. However, such is not the case here.

. Table 5F is a part of the record; it is also available on the Department's website at: http://www.louisianabelieves.com/resources/ library/minimum-foundation-program.

. According to Black's Law Dictionary, "matter” means a "subject under consideration.”

. The defendants emphasize the uniqueness of the procedures described by Article VIII, § 13(B) when urging us not to find that SCR 99 was intended to have the effect of law. According to their argument, anything that tracks through the legislative session, what is nominally a road to approving the MFP, is sui generis, and cannot therefore have the effect of law. This line of argument impermissibly elevates form over substance, as the plaintiffs point out by their hypothetical example of a highway construction appropriation being included in the MFP formula.

. The state defendants have argued that claims relating to the early graduation and course choice programs are outside the subject matter jurisdiction of the district court (and by implication those claims are outside the subject matter jurisdiction of this court also). The essence of the defendants' argument is “the Early Graduation and Course Choice Program have not been funded under *1059 the FY 2012-2013 MFP formula and will require future events to effectuate any funding.” However, as noted throughout this opinion, it is not these programs themselves that are the focus of our constitutionality review. Furthermore, as just noted, because the constitutionality review requires ascertaining whether SCR 99 was intended to have the effect of law, the inclusion of any subject matter outside the 2012-2013 MFP is especially germane to our effect-of-law inquiry.

. We express no opinion regarding whether or not the approval by the legislature of the MFP is to be considered an appropriation when the legislature acts merely to approve the formula submitted by BESE.

. SCR 99, XII(C).

. The early graduation program is not the only aspect of SCR 99 that purports to allocate funding beyond the current 2012-2013 school year. By the terms of SCR 99, 11(A)(4), if a later legislative session does not approve a new MFP formula, the legislature must nevertheless appropriate a different "per pupil amount,” which may be a 2.75 percent “growth adjustment” increase. Moreover, if successive legislative sessions do not yield a newly approved MFP formula, the 2.75 percent increase in SCR 99, 11(A)(4) "shall automatically be applied.” By the terms of SCR 99, 11(A)(4), the increased allocation is described as "beginning in the Fiscal Year 2013-2014” and is effective until such time as a new MFP formula is approved.

.House Rule 8.19 provides: "All instruments intended to have the effect of law shall be examined by the Legislative Bureau as *1061 provided in Joint Rule 3 of the Joint Rules of the Senate and the House of Representatives.”

. La. R.S. 24:175 provides:
A. Unless otherwise specifically provided therein, the provisions of each act of the legislature are severable, whether or not a provision to that effect is included in the act. If any provision or item of an act, or the application thereof, is held invalid, such invalidity shall not affect other provisions, items, or applications of the act which can be given effect without the invalid provision, item, or application.
B. This Section shall apply to acts of the legislature affecting general, and local and special laws, and statutes of the state, including the Louisiana Revised Statutes of 1950, the Civil Code of the state of Louisiana, the Louisiana Code of Civil Procedure, the Louisiana Code of Criminal Procedure, the Louisiana Code of Evidence, and the Louisiana Code of Juvenile Procedure.

. We note that, because we have found SCR 99 was not validly enacted, a severability analysis of SCR 99 is unwarranted. As pointed out earlier, the early graduation program was included in SCR 99, but not in Act 2. There is no viable legislative instrument establishing an early graduation program.

.The original provision, La. Const, of 1845, art. 118, read: "Every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title.” The same language appeared, substantially unchanged, in subsequent constitutions, with the exception of the Constitution of 1868, which briefly allowed for plurality in legislation. See La. Const. of 1852, art. 115; La. Const. of 1864, art. 118; La. Const. of 1868, art. 114; La. Const. of 1879, art. 29; La. Const. of 1898 & 1913, art. 31; La. Const, of 1921, art. Ill, § 16. The Constitution of 1879 restored the one-object requirement. See B. Newton Har-gis, Comment, Constitutional Limitations Upon Statute Titles in Louisiana, 6 La. L.Rev. 72, 73-74 (1944).

. Most recently, in Forum for Equality PAC v. McKeithen, 04-2477 (La.1/19/05), 893 So.2d 715, we attributed a similarly broad definition to the one-object requirement of La. Const, art. XIII, § 1(B), holding that "the 'single object' rule as restated in La. Const, art. XIII, § 1(B) requires that an amendment to the Constitution embodies a single plan and that every provision therein is germane to that plan.” Forum for Equality, 04-2477 at 24, 893 So.2d at 732. We further explained that what is germane is "that which is in close relationship, appropriate, relevant, or pertinent to the general subject.” Id., quoting Louisiana Public Facilities Authority v. Foster, 01-0009, p. 16 (La.9/18/01), 795 So.2d 288, 299.

. This presumption of constitutionality is consistent with our earlier discussion of the principles of review for constitutionality. See supra. As we noted, legislative instruments are presumed to be constitutional; therefore, the party challenging the validity of a legislative instrument has the burden of proving it to be unconstitutional. Citizen, 04-1841 at 11, 898 So.2d at 334. Sometimes that burden will be met, as demonstrated in the foregoing discussions of SCR 99 and Act 2; sometimes the burden will not be satisfied.

. The constitutional provision excepts from its ambit the general appropriation bill and bills for the enactment, rearrangement, codification or revision of a system of laws. See La. Const, art. Ill, § 15(A).

. A similar title analysis was conducted by this court in Louisiana Public Facilities Authority. In that case, the title of the act in question recited that it was "An Act”:
To amend and reenact R.S. 9:2343(B) and (E) and to repeal R.S. 9:2343(C), relative to public trusts; to increase the number of trustees of certain public trusts; to provide for their appointment; to provide for the terms of the trustees; to authorize certain public trusts to utilize sole source procurement provisions of the Louisiana Procurement Code; and to provide for related matters.
Louisiana Public Facilities Authority, 01-0009 at 15, 795 So.2d at 299, quoting 1999 La. Acts 1238, title (emphasis omitted).
In rejecting a "one object” challenge to the constitutionality of the act, this court found that the purpose of the act was to regulate public trusts by the means suggested in its title: by increasing the number of trustees of some public trusts, changing the trustees' method of appointment and the length of their terms, and authorizing some trusts to utilize the legislatively authorized sole source purchasing provisions. Louisiana Public Facilities Authority, 01-0009 at 17, 795 So.2d at 300. We concluded that "all parts of the Act are reasonably related to the general subject matter of the legislation: the regulation of public trusts,” Id., identifying the object of the act as the regulation of public trusts, and the language following "relative to public trusts” as the enumerated means of accomplishing that object.

. This conclusion is buttressed by an examination of the "Keyword” and “One-Liner” the legislature annexed to the bill. The legislative glossary defines the "Keyword” as the "[gjeneral subject of [a] bill or resolution that appears above the heading.” See www.legis. la.gov/legis/Glossary. The “One-Liner” is a "phrase or sentence that describes a bill or resolution. It appears on the bill or resolution after the keyword and before the heading ... and may be referred to as 'summary.' " Id. While not constituting a part of the proposed law, the keyword and one-liner are intended "to provide the members of the legislature with general indicia of the content of the bill.” La. R.S. 24:177(E)(1). In this case, the keyword and one-liner initially appearing in HB 976 recited: "SCHOOLS/CHOICE: Provides relative to the Student Scholarships for Educational Excellence Program, parent petitions for certain schools to be transferred to the RSD, charter school authorizers, and course providers."